[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13735

_____

LANDCASTLE ACQUISITION CORP.,

Plaintiff-Appellee,

*versus*

RENASANT BANK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:17-cv-00275-RWS

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and HULL, Circuit Judges.

HULL, Circuit Judge:

This case arises out of the insolvency of the Crescent Bank and Trust Company ("Crescent") and the conduct of its customer-lawyer Nathan Hardwick, a manager of his law firm, Morris Hardwick Schneider, LLC ("Hardwick law firm"). In 2009, Crescent, a Georgia bank, made Hardwick a loan for $631,276.71. Hardwick, as his law firm's manager, signed a security agreement that pledged, as collateral, his law firm's certificate of time deposit ("CD") for $631,276.71. So far, all looked hunky-dory, or facially valid in legal speak.

For five years, Hardwick's loan remained current. When Crescent failed, the Federal Deposit Insurance Corporation ("FDIC"), as receiver, took over and sold Hardwick's loan and CD collateral to Renasant Bank. Hardwick then made loan payments to Renasant, and Renasant held the CD collateral.

When Hardwick defaulted in 2014, the security agreement permitted Renasant to liquidate the CD collateral to pay the loan balance, which Renasant did. Renasant notified the Hardwick law firm of the loan default and CD liquidation but received no response—much less any objection—from the law firm.

Eventually, Hardwick's and his law firm's financial troubles caught up with them. The law firm filed for bankruptcy, and Hardwick was convicted of wire and financial fraud. *See United*

*States v. Maurya*, 25 F.4th 829, 835 (11th Cir. 2022). The bankrupt law firm had countless creditors, including plaintiff Landcastle Acquisition Corporation ("Landcastle"), which was assigned the law firm's potential claims against others.[1]

In 2017, Landcastle sued Renasant (as successor to the FDIC and Crescent), claiming Renasant was liable for $631,276.71, the CD amount. Landcastle's lawsuit seeks to invalidate the Hardwick law firm's security agreement.

That security agreement is unconditional and facially valid. But Landcastle alleges that Hardwick, the law firm's agent and manager, lacked authority to pledge its CD as collateral. In its attempt to invalidate the security agreement, Landcastle introduces and relies on the law firm's corporate records and testimony. Landcastle's evidence thus comes from *outside the failed bank's records*.

This case requires us to apply federal law developed from a combination of federal common law and a statute, known collectively as the "*D'Oench* doctrine." *See D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp.*, 315 U.S. 447, 62 S. Ct. 676 (1942); 12 U.S.C. § 1823(e). That estoppel doctrine applies when the FDIC takes over a failed bank and sells it to a solvent bank. *See D'Oench*, 315 U.S. at 460, 62 S. Ct. at 681. Just as the parol evidence rule bars extrinsic evidence to contradict a written contract, the *D'Oench*

---

[1] In 2016, the bankruptcy court approved Landcastle's $300,000 bulk purchase of any claims that the Hardwick law firm potentially had against others.

doctrine bars the use of evidence *outside the failed bank's records* to challenge the validity of a facially valid note, guaranty, or collateral pledge acquired by the FDIC from a failed bank and sold to a solvent bank, like Renasant. To be clear, *D'Oench* does not bar such challenges; rather, it limits what evidence can be used to mount those challenges.

Courts have developed this robust federal common law because the FDIC must be able to rely upon the *failed bank's official records* when it quickly estimates and sells a failed bank's assets—loans and collaterals—to a successor bank that takes over the failed bank's deposit liabilities. The FDIC's immediate sale enables the purchaser-successor bank, like Renasant, to open the failed bank the next morning with deposits (the failed bank's liabilities) available to customers without interruption. *See Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 91–92, 108 S. Ct. 396, 401 (1987); *Fed. Sav. & Loan Ins. Corp. v. Gordy*, 928 F.2d 1558, 1564 (11th Cir. 1991). Practically too, *D'Oench* affords the FDIC a super-charged, holder-in-due-course protection.

There's more relevant *D'Oench* law and more to Hardwick's tale but that gets us to the certified question:

> Does *D'Oench* bar a claim (or defense) that the agent [Hardwick] who signed the agreement [the CD security agreement] with the bank [Crescent] purportedly lacked authority to do so?

Applying the Supreme Court's and our Circuit's *D'Oench* precedent, we hold that Landcastle's lack-of-authority claims are barred because they rely on evidence that was *outside Crescent's records* when the FDIC took over that failed bank and sold the Hardwick loan and CD collateral to Renasant.

Indeed, none of Landcastle's evidence was in Crescent's records. Undisputedly too, Crescent had no knowledge that Hardwick lacked authority to pledge his own law firm's CD.

Although *D'Oench* bars Landcastle's non-bank-records evidence, Landcastle tries to escape *D'Oench*'s estoppel doctrine altogether. Landcastle makes a novel argument that seeks to slip in and use its non-bank-records evidence through another avenue.

To do that, Landcastle isolates the 2009 transaction and then tries to use the same non-bank-records evidence to claim the security agreement was "void," a legal nullity, and non-existent. From that, Landcastle argues Crescent itself never had any interest in the CD security agreement, the FDIC took over nothing from Crescent, the FDIC sold nothing to Renasant, and *D'Oench* protection was never triggered.

But to allow Landcastle to do indirectly—introduce non-bank-records evidence—what it cannot do directly in an FDIC case would eviscerate *D'Oench* equitable protection of the FDIC. That would mean every *facially valid* and *unqualified* note, mortgage, or collateral pledge assumed and sold by the FDIC as receiver would be subject to after-the-fact litigation based on

*non-bank-records* evidence alleging a former customer's manager lacked authority.  That use of evidence *outside the bank's records* is precisely what *D'Oench* is designed to avoid.

The Supreme Court teaches us that even if a note is "voidable," a failed bank can "transfer to the FDIC voidable title, which is enough to constitute 'title *or* interest' in the note" for purposes of the *D'Oench* doctrine.  *See Langley*, 484 U.S. at 93–94, 108 S. Ct. at 402.  Therefore, agent Hardwick's lack of authority, *even if proven by non-bank-records evidence*,[2] would render the security agreement, at most, voidable by the principal, but not void.  So Crescent had and transferred at least a voidable interest to the FDIC, which is adequate for *D'Oench* purposes.

Simply put, *D'Oench* bars Landcastle's attempt to use non-bank-records evidence to challenge the facially valid and unconditional security agreement acquired by the FDIC as receiver from the failed bank Crescent and sold by the FDIC to Renasant.

We divide our opinion into these six parts:

(1) we discuss the loan documents in Crescent's records when the FDIC took over;

---

[2] The district court found fact issues existed as to whether Hardwick had apparent authority to pledge the CD given that all three managers, shareholders, and directors commingled their personal finances with those of their law firm.  Further, the law firm's CD was held as collateral for over five years and liquidated without objection by the law firm—yet another fact evincing Hardwick's apparent authority.

(2) we examine the procedural history and Landcastle's evidence that all comes from outside the failed bank's records;

(3) we review Supreme Court and our precedent developing the *D'Oench* estoppel doctrine as federal common law;

(4) we apply those *D'Oench* principles and explain that Landcastle's lack-of-authority claims are barred *because* they are based on only *evidence outside Crescent's records*;

(5) we outline why we reject Landcastle's attempt to escape the *D'Oench* estoppel doctrine altogether; and

(6) lastly, we respond to the dissent.

## I.    CRESCENT'S LOAN AND CD RECORDS

The FDIC, created by Congress, works to insure deposits at banks and savings institutions. *See* 12 U.S.C. § 1811(a). When Crescent failed in 2010, the FDIC took over as receiver and, overnight, sold Crescent's assets and liabilities—including the Hardwick loan and CD collateral—to Renasant.

Prior to Crescent's failure, Hardwick induced Crescent in 2009 to make him a loan for $631,276.71: (1) by procuring a CD for $631,276.71 in the name of "Morris Hardwick Schneider, LLC"; and (2) by signing, on the same day, an agreement granting Crescent a security interest in the CD as collateral for his loan. Crescent also had his law firm's corporate resolution as to that CD.

When the FDIC took over as receiver, Crescent's bank records included Hardwick's note and these documents: (1) a

Hypothecation Agreement (the "security agreement") granting Crescent a security interest in the CD; (2) an Assignment of the CD; and (3) the Hardwick law firm's Corporate Resolution as to the CD. We review each in turn.

### A. Security Agreement as to the CD

The parties to the security agreement are: (1) Crescent, the "Lender"; (2) Nathan Hardwick, the "Borrower"; and (3) the Hardwick law firm, the "Pledgor." The first page of the agreement states, "[I]n consideration of loans granted by Lender [Crescent] to Borrower [Hardwick], the [Pledgor Hardwick law firm] . . . hereby *assigns the Lender all its right, title and interest to, and grants Lender a security interest in*," *the CD collateral*, described as CD #55529696. Hardwick signed for the Pledgor Hardwick law firm as "MANAGING MEM[BER]."

The security agreement provides that in the event of default, Crescent may dispose of the CD collateral as a secured party. Undisputedly, the plain terms of the agreement permitted Renasant to liquidate the CD to pay off Hardwick's loan balance.

### B. Assignment of CD

The CD was also assigned to Crescent as security for the payment of Hardwick's loan. The Assignment states, "Assignment of deposit or share account: For value received, I [the Hardwick law firm] assign and transfer to you [Crescent], and I give you a security interest in the following account(s): CRESCENT BANK

CD# 55529696." Hardwick signed the Assignment as the "MANAGING MEM[BER]" of the Hardwick law firm.

### C. Law Firm's Corporate Resolution as to the CD

Crescent's records contain a third document, entitled "Resolution of Corporation, Partnership & LLCs." The corporate resolution was signed by: (1) Hardwick, as both "MANAGING MEMBER" and "DESIGNATED REPRESENTATIVE" of the Hardwick law firm; and (2) Robert Driskell, the Hardwick law firm's Chief Financial Officer, as an "AUTHORIZED SIGNER." The corporate resolution was addressed to Crescent.

The second page of the corporate resolution states, "RESOLUTION APPLIES TO (check all that apply)." That second page has this box: "■ SPECIFIC ACCOUNTS ACCOUNT NUMBER(S): 55529696." That box was checked. That number is the CD number.

Below that checked box, the corporate resolution lists Hardwick and Driskell as the "Authorized Parties." The corporate resolution concludes with the proclamation: "IT IS FURTHER RESOLVED AS FOLLOWS, the Entity [the Hardwick law firm] certifies to the Financial Institution [Crescent] that: Unless specifically designated, each of the Authorized Parties [Hardwick and Driskell] whose signature appears above may sign without the other(s)."

## II.  PROCEDURAL HISTORY

In 2017, Landcastle filed this lawsuit against Renasant to recover the funds from the liquidated CD, alleging conversion and breach of contract.  Landcastle asserted that Hardwick lacked authority to pledge the Hardwick law firm's CD as collateral for his personal loan.

### A.  Summary Judgment Evidence

Following discovery, both parties moved for summary judgment.  Landcastle introduced documents about the Hardwick law firm's structure. *None of these documents were in Crescent's records.*  Yet we must review them because Landcastle bases its claims on them.

Landcastle's documents revealed that the lawyers in the firm's name—Arthur Morris, Hardwick, and Randolph Schneider—were not even "members" of the LLC law firm.  In actuality, the law firm was owned by a corporation called MHSLAW, P.C.  The designated "sole member" of the firm was MHSLAW, P.C.

Landcastle emphasizes that (1) although Hardwick was a manager, he was not a "*member*"; (2) only MHSLAW, P.C. was a "*member*"; and (3) only MHSLAW, P.C. had authority to pledge the CD.

Of course, nothing about MHSLAW, P.C. was in Crescent's records.  Instead, the CD was in the name of the Hardwick law firm.  Plus, Landcastle's documents show Hardwick (1) owned

50% of MHSLAW, P.C.'s stock, (2) was *"President"* and a *"director"* of MHSLAW, P.C., and (3) was a *"Manager"* of the firm.[3]  Hardwick ran the show, so to speak.

Now comes the twist that Landcastle tries to use, derived from a deep dive into MHSLAW, P.C.'s corporate structure. MHSLAW P.C.'s bylaws—also evidence outside the failed bank's records—state that a "director" cannot guarantee a debt over $10,000 *"without the affirmative vote of the majority of the votes entitled to be cast by the shareholders."*   And the law firm's operating agreement provides that a "Manager" cannot guarantee a debt over $10,000 *"without the affirmative vote of the Members holding a majority interest."*

---

[3] Hardwick's broad authority as President of MHSLAW, P.C. is demonstrated by how MHSLAW, P.C.'s bylaws describe his President's role:

> The President shall be the chief executive officer of the Company and shall have general and active management of the operation of the Company.  He shall be responsible for the administration of the Company, including general supervision of the policies of the Company and general and active management of the financial affairs of the Company, and shall execute bonds, mortgages, or other contracts in the name and on behalf of the company.

Similarly, the law firm's operating agreement designated Hardwick as a "Manager" and provided Hardwick with "complete power and authority to act on behalf of the Company, enter into contracts on behalf of the Company and otherwise bind the Company in any other manner."

Because Hardwick owned only 50% of MHSLAW, P.C. and not a majority interest, Landcastle contended (1) Hardwick needed the vote of another shareholder of MHSLAW, P.C., and (2) thus Hardwick lacked authority to *unilaterally* pledge his law firm's CD. Landcastle also filed declarations from Morris and Schneider—who each owned 25% of MHSLAW, P.C.'s stock—stating that they "did not vote to authorize either MHSLAW, P.C. or Morris Hardwick Schneider, LLC to pledge the CD as collateral."

## B.  District Court's Order and Certification

In 2020, the district court denied both parties' summary judgment motions.  The district court determined that "it is beyond dispute that Crescent Bank did not know that Hardwick lacked authority to pledge the CD."

In denying Renasant's motion, the district court identified as a threshold issue whether *D'Oench* bars Landcastle's claims, based on non-bank records, that Hardwick lacked authority to execute Crescent's security agreement.  The court likened Hardwick's lack of authority to a "forgery" that resembles "fraud in the factum." The court concluded that "fraud in the factum" rendered the CD security agreement "void" and thus *D'Oench* did not apply.

In denying Landcastle's motion, the district court found that the corporate documents of MHSLAW, P.C. and the Hardwick law firm revealed that Hardwick did not have *actual authority* to pledge the CD because (1) the "sole member" of the law firm was

MHSLAW, P.C., and (2) Hardwick, despite owning 50% of its stock, needed the vote of another shareholder to pledge the CD.

Nonetheless, the district court ruled that genuine fact issues existed as to whether Hardwick had *apparent authority* to pledge the CD. The court observed, *inter alia*, that all three managers of the LLC (who were also shareholders and directors of the LLC's sole member MHSLAW, P.C.) failed to follow corporate formalities and routinely commingled their personal finances with those of the company.[4]

In its same order, the district court certified two questions of law for immediate appeal pursuant to 28 U.S.C. § 1292(b). This Court granted Renasant's petition for an interlocutory appeal as to only the threshold question: "Does *D'Oench* bar a claim (or

---

[4] The dissent incorrectly claims that there is no evidence that Morris and Schneider—the other two managers, shareholders, and directors—knew about Hardwick's purchase of the law firm's CD or his pledge. Dissenting Op. at 3. But the record creates fact issues about what Morris and Schneider knew. For example, Morris testified he knew of Hardwick's financial troubles, and he "was [Hardwick's] daddy for ten years" because Morris knew the law firm "[couldn't] afford to have a major partner file for bankruptcy"; so Morris used personal funds and "weekly [bonus] payments" from the law firm given the "constant pressure on [Hardwick] from creditors for immediate funding." Even the district court found that "Renasant's evidence—in particular, the managers' use of [firm] funds to pay off Hardwick's personal debts" raised fact issues about how Morris and Schneider conducted firm business. In short, Morris and Schneider were self-acknowledged enablers of Hardwick's use of firm funds for his personal debts.

defense) that the agent who signed the agreement with the bank purportedly lacked authority to do so?"

### C. Standard of Review

"We review de novo a question of law certified by the district court pursuant to § 1292(b)." *Sec'y, U.S. Dep't of Lab. v. Preston*, 873 F.3d 877, 880 n.2 (11th Cir. 2017) (quotation marks omitted). While we "may not reach beyond the certified order, we may address any issue fairly included within the certified order." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1275 (11th Cir. 2020) (quotation marks omitted).

## III.    SUPREME COURT AND OUR *D'OENCH* PRECEDENT

In this appeal, the certified question assumes that Hardwick "purportedly" lacked authority to unilaterally pledge the CD. We proceed on that basis. In addition, Renasant stands in the shoes of the FDIC, and Landcastle in those of the Hardwick law firm.

Given *D'Oench* is not a doctrine we apply every day, we set forth the Supreme Court's *D'Oench* and *Langley* decisions and then five Eleventh Circuit decisions holding *D'Oench* barred a broad array of claims against the FDIC *when based on evidence outside the failed bank's official records*.

### A. *D'Oench* Doctrine

In 1942, the Supreme Court decided *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, creating what is known as the *D'Oench* doctrine. 315 U.S. 447, 62 S. Ct. 676. In *D'Oench*, the

20-13735                Opinion of the Court                15

FDIC conducted a purchase-and-assumption transaction of an insolvent bank and acquired a loan where the collateral was a demand note by the D'Oench company. *Id.* at 454, 62 S. Ct. at 678. When the FDIC sued to collect on the demand-note collateral, the D'Oench company asserted the defense of failure of consideration because the failed bank had agreed the note would not have to be paid. *Id.* at 456, 62 S. Ct. at 679. The undisclosed agreement was evidenced by written "receipts," stating: "This note is given with the understanding it will not be called upon for payment." *Id.* at 454, 62 S. Ct. at 678.

Yet the Supreme Court barred the D'Oench company's defense to the note *as a matter of law*. The Court concluded that the enforceability of the note was determined by federal common law rather than state law because of the federal policy to protect the FDIC. *See id.* at 457–61, 62 S. Ct. at 679–81. More specifically, the Supreme Court held that "secret agreements" could not be a defense to suit by the FDIC because such agreements would contravene *"a federal policy"* that *"protect[s] [the FDIC] and the public funds which it administers against misrepresentations* as to the securities or other *assets in the portfolios of the banks which [the FDIC] insures* or to which it makes loans." *Id.* at 457–58, 62 S. Ct. at 679–80 (emphases added). The written receipts reflecting the insolvent bank's agreement—that the note would not be paid— *were not in the bank's official records* when the FDIC assumed the bank's assets and liabilities, and thus were not enforceable against the FDIC. *Id.* at 461, 62 S. Ct. at 681.

### B. *Langley* and 12 U.S.C. § 1823(e)

Eight years after *D'Oench*, Congress passed The Federal Deposit Insurance Act of 1950, which broadened *D'Oench*'s protection of the FDIC. *See* 12 U.S.C. § 1823(e). Section 1823(e) imposes various requirements on "any agreement which tends to diminish or defeat the interest" of the FDIC in any asset acquired from an insolvent bank. *Id.* An agreement—that "tends to diminish or defeat" the FDIC's interest in an asset—is only valid against the FDIC if it, *inter alia*, is in writing, *is continuously an official record of the failed bank*, is executed by the bank itself, and satisfies other approval and filing requirements in § 1823(e). *Id.*

Thirty-seven years later, the Supreme Court in *Langley v. Federal Deposit Insurance Corp.* concluded that the *D'Oench* doctrine also protected the FDIC from claims raising "undisclosed conditions" and "fraud" as to "*a facially unqualified note*" the FDIC acquired from an insolvent bank. 484 U.S. at 92–93, 108 S. Ct. at 401–02 (emphasis added). In *Langley*, the FDIC sought to collect on the acquired note. *Id.* at 88–90, 108 S. Ct. at 400. The borrowers alleged their note was *"entirely void"* and no contract was formed because the failed bank itself procured their note through fraudulent misrepresentations about the land being purchased with the note's proceeds. *Id.* at 88–89, 108 S. Ct. at 400 (emphasis added).

Although the failed bank committed fraud, the Supreme Court concluded that the borrowers could not use *evidence outside the bank's official records* to assert a fraudulent-

inducement defense to the FDIC's enforcement of "a seemingly unqualified note." *Id.* at 92–93, 108 S. Ct. at 402. The Court discussed how, when a bank fails, the FDIC must decide whether to (1) liquidate the bank's assets (its loans) and much later pay the bank's customers their deposits; or (2) provide public-funds financing for a solvent ongoing bank to purchase the failed bank's assets (its loans) and assume its liabilities (its deposits), thus avoiding an interruption in banking services. *See id.* at 91, 108 S. Ct. at 401. The FDIC's evaluations "must be made with great speed, usually overnight" so that the successor bank opens the next morning with deposits accessible to customers without interruption and with assigned loans roughly equal to the assumed deposit liabilities. *See id.*, 108 S. Ct. at 401 (quotation marks omitted).

The Supreme Court concluded that the FDIC would not "be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." *Id.* at 92, 108 S. Ct. at 401. The Court clarified that "[a] condition to payment of a note . . . is part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." *Id.* at 96, 108 S. Ct. at 403.

In *Langley*, the borrowers' "fallback position" was that a bank's misrepresentation should fall outside the scope of *D'Oench* and § 1823(e) "when the misrepresentation was fraudulent and the FDIC had knowledge of the asserted defense at the time it acquired the note." *Id.* at 93, 108 S. Ct. at 402. In rejecting that claim, the

Supreme Court distinguished between "fraud in the factum" and "fraud in the inducement." *See id.* at 93–94, 108 S. Ct. at 402.

The Court observed that *fraud in the factum* (1) is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents"; (2) which "would take the instrument out of § 1823(e), because it would render the instrument entirely void"; and (3) would leave the FDIC with "no right, title or interest that could be diminished or defeated." *Id.*, 108 S. Ct. at 402 (cleaned up).

On the other hand, the Court explained that "*fraud in the inducement . . . renders the note voidable but not void,*" and "[t]he *bank therefore had and could transfer to the FDIC voidable title, which is enough to constitute title or interest in the note.*" *Id.* at 94, 108 S. Ct. at 402 (emphases added and quotation marks omitted). The Court reasoned that (1) "[t]his conclusion is not only textually compelled, *but produces the only result in accord with the purposes of the statute,*" and (2) "[i]f voidable title were not an 'interest' under § 1823(e), the FDIC would be subject not only to undisclosed fraud defenses but also to a wide range of other undisclosed defenses that make a contract voidable." *Id.*, 108 Ct. at 402 (emphasis added).

The Court held that "neither fraud in the inducement nor knowledge by the FDIC is relevant to the section's application." *Id.* at 93, 108 S. Ct. at 402. The Court pointed out that "a voidable interest is transferable whether or not the transferee knows of the misrepresentation or fraud that produces the voidability." *Id.* at 94,

108 S. Ct. at 403.  The Court stressed that *"the equities [that] the statute regards as predominant" are those protecting the FDIC. See id.* at 94–95, 108 S. Ct. at 403 (emphasis added).

*Langley* teaches three federal common-law lessons under *D'Oench*: (1) even if *the failed bank itself* made material misrepresentations and fraudulently induced the borrower to enter into a promissory note, the bank's admitted fraud against a borrower renders the borrower's note only *"voidable but not void"*; (2) the failed bank's transfer of a voidable note to the FDIC is enough to grant the FDIC title or interest in the note; and (3) a borrower cannot use documents *outside the failed bank's official records* to challenge a facially valid and unqualified note acquired by the FDIC from a failed bank.  *See id.* at 93–94, 108 S. Ct. at 402–03.

We now review our Circuit and other precedent faithfully applying these *D'Oench* principles as federal common law. Repeatedly, our Court has emphasized that the FDIC cannot make a reliable evaluation, nor can a successor-purchaser bank, if a failed bank has facially valid and unconditional loan assets that are sold and then much later a party can challenge them based on documents *outside the failed bank's records*.

## C. *FSLIC v. Two Rivers Associates, Inc.*

In 1989, this Court faced a situation where the failed bank's official records did provide some support for the borrower's defense.  Nonetheless, this Court concluded that the *D'Oench*

doctrine still protected both the FDIC and the Federal Savings and Loan Insurance Corporation ("FSLIC") from claims relying on official bank records, unless those bank records contained an "explicit acceptance" of a specific legal obligation by the failed bank. *Fed. Sav. & Loan Ins. Corp. v. Two Rivers Assocs., Inc.*, 880 F.2d 1267, 1276 (11th Cir. 1989) ("*Two Rivers*").[5]

In *Two Rivers*, after a bank failed, the FSLIC as receiver instituted foreclosure proceedings against a borrower that had defaulted on its mortgage. *Id.* at 1270. A subordinate creditor opposed the foreclosure and filed affidavits from officials at the insolvent bank stating that the bank had agreed to fund the borrower's entire project. *Id.* at 1273. The creditor argued, *inter alia*, that *D'Oench* should not apply because the bank's agreement to fund the entire project was not "secret" *but reflected in the failed bank's own records*. *Id.* at 1275.

The FSLIC contended that under federal common law the creditor was "estopped from asserting his defenses and counterclaims" based on documents and an agreement not in the failed bank's records. *Id.* at 1273. In holding *D'Oench* barred the creditor's claim against the FSLIC, this Court found the failed bank's records contained evidence of an "obligation to provide an

---

[5] As to the FSLIC, this Court agreed with other circuits that *D'Oench* "should protect the FSLIC to the same extent it protects the FDIC." *Two Rivers*, 880 F.2d at 1274–75. On August 9, 1989, the FSLIC was abolished, and the FDIC became its statutory successor. *See Gordy*, 928 F.2d at 1559 n.1.

additional" loan.  *Id.* at 1275–76 (emphasis omitted).  This Court, however, still applied *D'Oench* to bar the creditor's claim because the bank's records contained no "explicit acceptance of the obligation to fund the entire project."  *Id.* at 1276.

In so ruling, this Court observed that the *D'Oench* doctrine "allow[s] the FDIC to rely on bank records . . . when taking over a failed bank."  *Id.* at 1275.  Adhering to *Langley*, our Court emphasized that "neither the FDIC nor the state banking authorities would be able to make a reliable evaluation if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions."  *Id.* at 1276 (alterations adopted) (quoting *Langley*, 484 U.S. at 91–92, 108 S. Ct. at 401).

Our Court also stressed: While the creditor's arguments and affidavits "might be appropriate in a suit against [the insolvent bank]" had the bank not failed, they were "not sufficient in this case to survive summary judgment against the FSLIC."  *Id.*  In other words, while under state law a creditor's claim may be viable against a failed bank, under federal common law, the creditor "[i]s estopped" from asserting claims based on documents not in the failed bank's records.  *See id.* at 1277.

### D. *FDIC v. McCullough*

Extending the federal common-law *D'Oench* doctrine further, this Court has held *D'Oench* barred borrowers' claims that a note and mortgage were entirely "*void*" based on "failure to perform a condition precedent, failure of consideration, and

fraudulent inducement." *Fed. Deposit Ins. Corp. v. McCullough*, 911 F.2d 593, 600–02 (11th Cir. 1990) (emphasis added).

*McCullough* is particularly instructive here. In that case, Charles Little borrowed over $1 million from Twin City FSB, a local bank, secured by a mortgage on various properties. *Id.* at 595. The borrowers assumed Little's debt held by Twin City. *Id.* at 595–96. When Twin City failed, the FSLIC, as receiver, sued the borrowers to recover the debt. *Id.* at 596. In defense, the borrowers contended that (in consideration of their assuming Little's debt) the failed Twin City had promised to convey to them title to certain properties and oil leases. *Id.*

The borrowers argued: (1) "the note and mortgage should be considered *void* because Little and [the failed] Twin City had *fraudulently induced* them to assume Little's prior indebtedness"; (2) "the transaction should be declared *void due to a failure of consideration*"; and (3) "the mortgage being sued upon *was legally insufficient* because the notarization was not conducted in accordance with Alabama law." *Id.* (emphases added).

In affirming the grant of summary judgment for the FSLIC, this Court addressed the scope of *D'Oench*. *Id.* at 599. Even though *D'Oench* involved a secret agreement, we observed that "the policy considerations leading to the development of federal common law in *D'Oench* have resulted in extension of the *D'Oench* estoppel doctrine well beyond" its initial factual setting. *Id.* at 600. Borrowers' claims and defenses based "upon unrecorded promises or schemes"—even if creating claims *of fraudulent*

*inducement or failure of consideration*—"are now also generally precluded by *D'Oench* and its progeny." *Id.* Our Court again underscored that "[s]uch defenses if allowed against the FSLIC or the FDIC would, like the defense at issue in *D'Oench*, contravene the primary federal policy that the FSLIC and the *FDIC must be able to rely upon financial institutions' records in order to best protect the public funds they administer.*" *Id.* (emphasis added).

Our Court concluded, to put the FSLIC on notice of the failed bank's obligation to transfer the mortgaged or other property, there must be "*explicit documentation* evidencing [the failed bank's] *obligation* to transfer specific properties to the McCulloughs." *Id.* at 601. While there were two documents in the bank's records with references to transfers of additional property, those documents were legally insufficient under *D'Oench* to give notice to the FSLIC that the failed bank "had made a fixed commitment" to transfer property. *Id.*

This Court also rejected the McCulloughs' argument that the mortgage securing the note was legally insufficient. *Id.* at 602–03. "Although facially appearing to be a valid, legal mortgage, the parties agree[d] that the mortgage was not witnessed or acknowledged in proper fashion" under Alabama law. *Id.* at 602. *The borrowers argued that under state law this flaw rendered the bank's mortgage "voidable" and "insufficient to pass legal title" to the property described in the mortgage. Id.* (emphases added).

In holding *D'Oench* barred that claim, this Court compared *D'Oench*'s protection of the FDIC and FSLIC as analogous to state

law protection of "a holder in due course." *Id.* Our reasoning was: "Although the error in acknowledgement might render the mortgage voidable were this suit between two private parties litigating under state law, we conclude that the FSLIC's *federal common law defenses* bar the McCulloughs' claim of improper notarization. On its face, the mortgage appears valid." *Id.* (emphasis added).

Our Court also concluded that the FSLIC, if accorded holder-in-due-course status under Alabama law, "could not be said to have had notice of the irregularity of which the McCulloughs now complain." *Id.* at 604. In any event, the irregularity in the mortgage is not cognizable against a holder in due course. *Id.* So long as the disputed note or loan in the bank's records appears facially valid, the FDIC as receiver is allowed to rely on it with the protection of the D'Oench doctrine. *See id.* at 602.

### E. *Twin Construction, Inc. v. Boca Raton, Inc.*

Once more this Court faced a scenario where a document in the failed bank's official records supported a party's claim against the FDIC. Nevertheless, this Court held that a document in the failed bank's records is not enough to bring a party's claim outside of *D'Oench* protection *unless* the document was executed by the failed bank. *See Twin Constr., Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 382–84 (11th Cir. 1991). We discuss *Twin Construction* as it (1) rejected arguments that *D'Oench* bars only borrowers' claims; (2) concluded that *D'Oench* applies to collateral pledge agreements

20-13735                 Opinion of the Court                 25

securing a loan; and (3) emphasized that *D'Oench* requires courts "to look beyond contract law." *See id.*

A shopping center owner obtained a loan from Old Vernon bank and pledged the property as collateral in a mortgage. *Id.* at 379–80. Twin Construction built the shopping center. *Id.* at 380. A document *in the bank's official records*, entitled "Contractor's Consent," stated that the bank would reserve sufficient funds in the owner's loan to pay and satisfy the owner's agreement with Twin Construction (the "bank document"). *Id.* Twin Construction signed Old Vernon's bank document. *Id.*

When Old Vernon did not pay, Twin Construction sued the bank: (1) to foreclose its mechanic's lien for $1.5 million and to elevate that lien above Old Vernon's mortgage; (2) for breach of the bank's written contract to reserve funds to pay Twin Construction; and (3) for fraud. *Id.* In a separate action, Old Vernon sued the shopping center owner for defaulting on its loan and mortgage. *Id.* Old Vernon alleged its mortgage had priority over Twin Construction's lien. *Id.* Twin Construction joined that lawsuit, making similar allegations as those in its own suit. *Id.* Thereafter, the bank failed. *Id.*

Ultimately, the FSLIC, as receiver, took over, consolidated the cases, and contended *D'Oench* barred Twin Construction's claims against Old Vernon (now the FSLIC). *Id.* Twin Construction responded that *D'Oench* did not apply to its claims based on an official bank record and barred only (1) claims asserted by the borrower (the shopping center owner), and (2) unwritten

agreements between the borrower and the failed bank. *Id.* at 381. Because the bank document in the failed bank's own records represented Old Vernon would reserve loan funds to pay Twin Construction, Twin Construction contended there was no secret agreement. *Id.* at 383.

This Court held *D'Oench* barred Twin Construction's claims. *Id.* at 384–85. In doing so, our Court outlined the evolution of the federal "*D'Oench* common law" and how it protects the FDIC, the FSLIC, and their successors "from *claims of state and common law fraud, violation of state or federal securities laws, and the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration and usury*." *Id.* at 382 (emphasis added).

We rejected Twin Construction's argument that *D'Oench* applies only to claims asserted by a borrower. *Id.* We pointed out that "*D'Oench* and section 1823(e) have affected monetary obligations including a mortgage, a letter of credit or personal guaranty *or collateral pledge agreement securing a loan*, rental payments under a lease, and a refund provision in an insurance contract." *Id.* (emphasis added). *D'Oench* applies to *any* asset of the failed bank acquired by the FDIC or FSLIC because "[f]ederal regulatory authorities need to make reliable evaluations of the assets of a financial institution." *Id.*

As to whether *D'Oench* barred Twin Construction's claims against the FSLIC based on a document in the failed bank's records, this Court made clear that *D'Oench* requires courts "to *look beyond normal contract law*." *Id.* at 383 (emphasis added). Since

Old Vernon's bank document was signed by only Twin Construction and not by the bank, it "does not establish that the non-signatory [bank] is required to perform any obligations contained in the document. Instead, it would be necessary to resort to an assessment of the non-signatory's words or acts in order to determine whether that party is so bound." *Id.* at 384.

This Court also stressed that "[b]ank examiners must reliably evaluate the worth of a bank's assets 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.'" *Id.* (quoting *Langley*, 484 U.S. at 92, 108 S. Ct. at 401). "That a document is written and in the bank's records is not enough to bring the case outside *D'Oench* and section 1823(e)." *Id.* at 383. In order to impose any legal obligation of the bank on the FSLIC, the document must be "executed," i.e., signed, by the bank, as well as in the bank's records. *Id.* at 384; *see* 12 U.S.C. § 1823(e)(2).

### F. *FSLIC v. Gordy*

In a similar vein, this Court in *Federal Savings & Loan Insurance Corp. v. Gordy* held that *D'Oench* protected the FSLIC from a guarantor's fraud claim that the failed bank had falsely misrepresented its financial statements. 928 F.2d at 1559–60, 1566. In *Gordy*, two individuals (guarantors of a letter of credit) negotiated a plan to acquire and develop a hotel. *Id.* at 1560. During the negotiations, the bank provided them with "a written statement of [the bank's] financial condition," portraying "a sound financial condition," even though the bank was insolvent. *Id.*

After the bank failed, the FSLIC sought payment from the guarantors. *Id.* The guarantors argued *D'Oench* was inapplicable because the bank's own misrepresentations constituted fraud in the factum. *Id.* at 1561.

The *Gordy* Court held that *D'Oench* applied to bar the guarantor's fraud claim. *Id.* at 1564. The bank's financial statement in *Gordy* was a "condition of payment" that was not "memorialized in writing or otherwise made explicit such that the FSLIC or the FDIC would have knowledge of the bank's obligations during an evaluation of the bank's records." *Id.* (quotation marks omitted). So *D'Oench* applied to protect the FSLIC from the guarantor's fraudulent misrepresentation claim. *Id.*

*D'Oench* applied "even in the absence of bad faith, recklessness or negligence" on the part of the guarantors seeking to invalidate their guaranty. *Id.* at 1566; *see Baumann v. Savers Fed. Sav. & Loan Ass'n*, 934 F.2d 1506, 1515 (11th Cir. 1991) ("[T]he *D'Oench* doctrine applies even where the customer is completely innocent of any bad faith, recklessness, or negligence.").

Similar to the Supreme Court's *Langley*, this Court explained the material difference between fraud in the factum and fraud in the inducement. *Gordy*, 928 F.2d at 1565. The *Gordy* Court held that the false financial statement was not fraud in the factum, but was "fraud in the inducement," and *D'Oench* applied. *Id.* at 1566. This Court described fraud in the factum "as 'the sort of fraud that procures a party's signature to an instrument without

knowledge of its true nature or contents,'" rendering the agreement entirely void. *Id.* at 1565 (quoting *Langley*, 484 U.S. at 93, 108 S. Ct. at 402). Conversely, fraud in the inducement "does not go to the very essence of the agreement but rather merely induces the party to enter the agreement," rendering the agreement "voidable and thus capable of transfer."[6] *Id.*

### G. *First Union National Bank of Florida v. Hall*

Significantly, this Court has instructed that the "common-law" *D'Oench* doctrine serves as a super-charged parol evidence rule that precludes evidence of an agreement that tends to diminish or defeat the FDIC's interest in any asset acquired from a failed bank. *First Union Nat'l Bank of Fla. v. Hall*, 123 F.3d 1374, 1379 n.9, 1380–81 (11th Cir. 1997). In *Hall*, First Union sued Hall to collect on his defaulted note that it acquired through a purchase-and-assumption agreement with the FDIC. *Id.* at 1376. Hall claimed that the insolvent bank "had agreed to limit its remedies in the event of default." *Id.* Hall offered affidavits and documents to prove that such an agreement existed, including the affidavit of Harrison, a former bank officer. *Id.* at 1380. First Union argued that *D'Oench* barred Hall's claim and evidence. *Id.* at 1376.

---

[6] To be complete, this Court has created an exception to *D'Oench* for "free standing tort claims that are not related to a specific asset acquired by the FDIC." *Vernon v. Fed. Deposit Ins. Corp.*, 981 F.2d 1230, 1233–34 (11th Cir. 1993); *Vernon v. Resol. Tr. Corp.*, 907 F.2d 1101, 1108 (11th Cir. 1990). Here, no party relies on this free standing tort exception, so we need not discuss it.

This Court ruled that the "common-law" *D'Oench* doctrine "flatly prohibits parol evidence." *Id.* at 1380. "Allowing Hall to present parol evidence, such as Harrison's affidavit, would force the FDIC and its transferees to look beyond the plain terms of the documents. That is a burden of which the *D'Oench, Duhme* doctrine seeks to relieve them." *Id.* at 1381. This Court, therefore, held that Hall's parol evidence was barred by the "common-law" *D'Oench* doctrine. *Id.* at 1379 n.9, 1381.

Although this concludes our outline of relevant Circuit precedent, we review one state decision because it applies the federal *D'Oench* doctrine to bar a lack-of-authority claim.

### H. *Federal Financial Co. v. Holden*

Applying federal common law, the Georgia Supreme Court has held that *D'Oench* protects the FSLIC as receiver from a property owner's claim that a partner *lacked authority* to pledge a security interest in property. *Fed. Fin. Co. v. Holden*, 485 S.E.2d 481, 483 (Ga. 1997). In *Holden*, three brothers, who were three of the four members of a partnership, executed a security deed conveying to a bank title to property owned by the partnership. *Id.* at 482. The three brothers lacked authority to convey the partnership property. *Id.* The bank failed, the FSLIC became receiver, and Federal Financial, as the FSLIC's successor, became the assignee of the security deed and the note it secured. *Id.*

Plaintiff Holden was not paid for his work on the property. *Id.* He filed a lien and sued to set aside the failed bank's senior

20-13735                Opinion of the Court                31

security deed. *Id.* Holden claimed the bank's security deed was worthless because the three brothers lacked authority from the partnership to pledge the property as security. *Id.* Fact issues existed as to who owned the property, what authority the brothers had, and what the bank knew. *See id.* A jury found "that the property was partnership property, that the bank *had knowledge* that the property was partnership property, and that the brothers *did not have authority* from the partnership to execute the security deed." *Id.* (emphases added). The state trial court canceled the bank's security deed and established Holden's lien. *Id.*

Based on the federal *D'Oench* doctrine, the Georgia Supreme Court reversed and entered judgment *as a matter of law* for Federal Financial, the FSLIC's successor. *Id.* at 483. The Court pointed out that Holden's attack on the security deed was based on "two unrecorded agreements" *that were not in the bank's official records*: (1) the partnership agreement, and (2) the agreement between the brothers and the bank permitting them to pledge partnership property. *See id.* Even where the failed bank knew the property was partnership property and the brothers lacked authority to pledge it, the Georgia Supreme Court concluded that *D'Oench* still protected the FSLIC from claims based on documents *that were not in the bank's official records*. *Id.*

We now apply these *D'Oench* principles.

## IV.　APPLICATION OF *D'OENCH* TO THIS CASE

To begin, the factual scenario here fits squarely within *D'Oench*. Overnight, the FDIC as receiver took over the failed Crescent and sold its assets (loans) and liabilities (deposits) to Renasant. *See Langley*, 484 U.S. at 91, 108 S. Ct. at 401. Undisputedly, the Hardwick note and the pledged CD collateral are loan assets the FDIC sold to Renasant.

### A.　Failed Bank's Records

Next, to apply *D'Oench*, we must examine what the failed bank's records showed.

Those records contained the security agreement that unambiguously and unconditionally pledged the Hardwick law firm's CD to Crescent as security for Hardwick's personal loan. *See McCullough*, 911 F.2d at 600. Hardwick executed the agreement as managing member of the Hardwick law firm. Crescent even had the law firm's corporate resolution as to the CD, which listed Hardwick as the managing member and authorized party to sign for the law firm. For *D'Oench* purposes, the agreement itself appeared facially valid.

Then for over three years, and after the FDIC's sale to Renasant in 2010, Hardwick continued to pay on his loan, and Renasant continued to hold the law firm's CD as collateral for Hardwick's personal loan. When Hardwick defaulted in 2014, the terms of the security agreement plainly permitted Renasant to liquidate the CD to pay off Hardwick's personal loan balance.

### B. Landcastle's Evidence Outside the Bank's Records

Now applying *D'Oench*, we conclude that Landcastle's claims against the FDIC and Renasant—that Hardwick lacked authority to sign the security agreement—are barred *because they rely on evidence outside the bank's records*. *D'Oench* "flatly prohibits" consideration of Landcastle's "parol evidence." *See Hall*, 123 F.3d at 1380. For purposes of summary judgment, we accept that (1) those *outside* documents prohibited Hardwick, although President and 50% owner of MHSLAW, P.C. and a manager of the Hardwick law firm, from guaranteeing debt over $10,000 without the vote of another shareholder; (2) the testimony states that no such vote occurred; and (3) Hardwick lacked authority to enter into and execute the security agreement.

However, none of the law firm's documents, nor any of this testimony, was in the failed bank's own records. The *D'Oench* doctrine thus protects the FDIC from a claim or defense that relies on documents and evidence not found in the failed bank's official records. *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 595 (11th Cir. 1995) (en banc); *see Two Rivers*, 880 F.2d at 1274; *McCullough*, 911 F.2d at 600; *Hall*, 123 F.3d at 1379.

Throughout its brief, Landcastle argues that *D'Oench* applies only to oral and written "agreements" outside the bank's records. Landcastle mistakenly focuses narrowly on the word "agreement" in § 1823(e). As explained above, *D'Oench* is a federal common-law doctrine that extends well beyond § 1823(e) and broadly protects the FDIC from a claim or defense based on fraud,

undisclosed conditions, failure of consideration, and pre-conditions to payment, *when based on documents not in the bank's records*. Landcastle's claims fit that description, as they rely on outside law firm documents and testimony to show that Hardwick lacked authority to sign the security agreement with the failed bank.

### C. Crescent's Lack of Documentation

Shifting its argument, Landcastle asserts that it is not the law firm's governance documents but Crescent's *lack* of documentation from the law firm that makes *D'Oench* inapplicable.  Landcastle contends that (1) the corporate resolution did not go far enough and expressly authorize Hardwick to pledge the law firm's CD as collateral; (2) the insolvent bank thus lacked adequate documentation that Hardwick had authority; and (3) because Hardwick was pledging his law firm's CD for his personal loan, the loan transaction was suspicious and should have placed Crescent on notice that Hardwick lacked authority.

To be clear, nothing herein addresses what claims or evidence the Hardwick law firm might have made or used against Crescent if Crescent had not failed and had liquidated the CD. Rather, this case is only about what claims and evidence can be made or used against the FDIC as receiver (and Renasant).

As to the FDIC, Landcastle attempts to impose a pre-condition—the bank's obtaining a written authorization of Hardwick's authority from the law firm—on the otherwise unconditional terms of the security agreement.  Landcastle's

authority requirement would condition the validity and enforceability of the security agreement on obtaining something outside the bank's records. Nothing in the terms of the security agreement required a law firm or corporate resolution for its validity. As to the FDIC, the security agreement was facially valid.

Regarding the *lack* of documentation, both parties debate the legal effect of the Hardwick law firm's corporate resolution that was in the bank's records. However, as the district court found: "*[I]t is beyond dispute that Crescent Bank did not know that Hardwick lacked authority to pledge the CD.*"

We need not resolve the debate over the legal effect of the corporate resolution, if any, because nothing in the corporate resolution limits or disclaims Hardwick's authority to pledge the CD. Nothing in the corporate resolution varies, contradicts, or alters the plain terms of the security agreement.

At bottom, Landcastle's claims—that Hardwick lacked authority to unilaterally pledge the CD—rely on MHSLAW, P.C.'s and the law firm's documents and testimony *outside* the failed bank's records and are thus barred by the *D'Oench* doctrine.

## V.    LANDCASTLE'S CLAIMS ARE SUBJECT TO *D'OENCH*

What Landcastle is left to argue all revolves around its attempt to escape *D'Oench*'s estoppel doctrine altogether.

Landcastle isolates the loan-CD transaction and argues that Hardwick's lack of authority rendered the security agreement entirely "void," a legal nullity, and non-existent back in 2009, and

incapable of being transferred to the FDIC. From that, Landcastle argues the FDIC obtained nothing from Crescent—no title to or interest in the security agreement—and thus the FDIC sold nothing to Renasant and *D'Oench* has no application here. Landcastle also argues that Hardwick's exceeding his authority constitutes fraud in factum.

In response, Renasant and amici (the FDIC and the American and Georgia Bankers Associations) argue persuasively that: (1) no fraud in factum occurred; (2) agent Hardwick's lack of authority, at most, rendered the security agreement potentially "voidable" by the principal law firm, but not "void"; and (3) thus Crescent had and did transfer an interest in the security agreement. They emphasize *Langley* which instructed: "Fraud in the inducement . . . renders the note *voidable but not void*. The bank therefore had and could transfer to the FDIC *voidable title*, which is enough to constitute 'title *or* interest' in the note" for *D'Oench* purposes. *Langley*, 484 U.S. at 94, 108 S. Ct. at 402 (emphases added and citation omitted).

We address each of Landcastle's arguments in turn.

### A.  Fraud in the Factum

We first reject Landcastle's claims that Hardwick's exceeding his authority constitutes fraud in the factum. The Supreme Court in *Langley* made clear that "fraud in the factum" is only the narrow sort of real fraud that "procures a party's signature to an instrument without knowledge of its true nature or

contents." *Id.* at 93, 108 S. Ct. at 402. Similarly, this Court has described "fraud in the factum" as "fraud which occurs within the instrument itself, and as fraud arising when a party signs a document without full knowledge of the character or essential terms of the instrument." *Gordy*, 928 F.2d at 1565 (quotation marks and citation omitted). There must be fraud in the procurement of a person's signature itself that leaves the signer unaware of the nature of the document he has signed. *See Langley*, 484 U.S. at 93, 108 S. Ct. at 402.

Landcastle does not dispute that *Hardwick* actually signed the security agreement and *knew what he was signing*. There is no allegation that Crescent engaged in the fraudulent procurement of Hardwick's signature, and accordingly there is no forgery or fraud in the factum here. Just the opposite, Hardwick's apparent fraud— purportedly lacking authority to pledge the CD—induced Crescent to make him a loan because it was fully collateralized by a CD in precisely the same amount of $631,276.71.[7]

### B. Landcastle's "Void" Claim

To avoid *D'Oench* altogether, Landcastle also argues that Hardwick's lack of authority rendered the security agreement

---

[7] There is no fraud in the factum here, so we need not address whether a fraud-in-the-factum claim is an exception to the *D'Oench* doctrine. *See McCullough*, 911 F.2d at 602 n.7 ("Although it is possible that a claim of fraud in the factum would survive [the] FSLIC's invocation of the *D'Oench* doctrine, we need not decide this issue." (citation omitted)).

"void," a legal nullity, and non-existent, and incapable of transfer to the FDIC. From that, Landcastle contends the FDIC obtained nothing, and *D'Oench* categorically does not apply here.

Landcastle's arguments fail to recognize the material differences between "void" and "voidable" contracts. As explained below, even if Hardwick lacked authority, the security agreement was not a "void" contract but, at most, a "voidable" contract. Here's why.

It is axiomatic that a "void" contract, as distinct from a "voidable" one, is "a legal nullity." 1 Williston on Contracts § 1:20 (4th ed. Oct. 2022 Update). A void contract has "no legal effect" whatsoever. *Void*, Black's Law Dictionary (11th ed. 2019). "Whenever technical accuracy is required, *void* can be properly applied only to those provisions that are of no legal effect whatsoever—those that are an absolute nullity." *Id.* "A contract may be void because it is technically defective, contrary to public policy, or illegal." *Void Contract*, Black's Law Dictionary (11th ed. 2019).

While voidable contracts are "a common occurrence in the law," 1 Williston on Contracts, *supra*, § 1:20, examples of wholly void contracts "are not very numerous," 1 Corbin on Contracts § 1.7 (Rev. ed. 2018). They include illegal bargains or bargains that are contrary to express statutes or that violate public policy. 1 Williston on Contracts, *supra*, § 1:20; *see, e.g.*, O.C.G.A. §§ 13-8-1 ("A contract to do an immoral or illegal thing is void."), 13-8-2(a) ("A contract that is against the policy of the law cannot be

enforced."), 13-8-3(a) ("Gambling contracts are void[.]").   Void promises are not legally binding, have no legal effect, and therefore are not contracts.   1 Williston on Contracts, *supra*, § 1:20; *see* Restatement (Second) of Contracts § 7 cmt. a (Am. L. Inst. 1981) ("A promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor is often called a void contract.").

In contrast, the term "voidable" contract is defined as "[v]alid until annulled," and "capable of being affirmed or rejected at the option of one of the parties."   *Voidable*, Black's Law Dictionary (11th ed. 2019).   Our Court has distinguished void from voidable contracts: "A contract is void *ab initio* if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract."   *Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923, 934 n.6 (11th Cir. 2021) (citing Black's definitions of void and voidable).

The treatises agree that a "voidable" contract is one where a party may elect to reject and avoid the legal relations created by the contract or by ratification may extinguish the power to avoid. Restatement (Second) of Contracts, *supra*, § 7 ("A voidable contract is one where one or more parties have the power . . . to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance."); 1 Williston on Contracts, *supra*, § 1:20 (same, quoting Restatement (Second) of Contracts § 7); 1 Corbin on Contracts, *supra*, § 1.6.   It bears

repeating that a "voidable contract is a common occurrence."  1 Williston on Contracts, *supra*, § 1:20.

Further, "a voidable contract imposes on the parties the same obligations as if it were not voidable.  If a contract is voidable, it remains intact until the party who has the power of avoidance elects to exercise it, and a party who has the power of avoidance may extinguish that power by ratification of the contract."  *Id.* (footnote omitted); 1 Corbin on Contracts, *supra*, § 1.6 ("In the case of a voidable contract, there is usually both a power to avoid and a power to validate by ratification.").

The concept of a voidable contract "rests primarily on the traditional view that the transaction is valid and has its usual legal consequences until the power of avoidance is exercised." Restatement (Second) of Contracts, *supra*, § 7 cmt. e; *see also* 1 Williston on Contracts, *supra*, § 3:6 ("When a contract is 'voidable' as a result of an invalidating cause, it nevertheless remains valid and enforceable unless and until the party entitled to avoid the obligation exercises that right.").

Examples of voidable contracts include situations where an invalidating cause, like duress, fraud, mental illness, or minor status, render a facially valid contract "voidable."  Restatement (Second) of Contracts, *supra*, § 7 cmt. b; 1 Williston on Contracts, *supra*, § 1:20; *see, e.g.,* O.C.G.A. §§ 13-3-20 (minor status), 13-3-24(a) (mental illness or incompetency), 13-3-25 (intoxication), 13-5-5 (fraud), 13-5-6 (duress).

The same is true for lack of authority. Specifically, if an agent without authority signs a written contract on behalf of a principal, the resulting contract is "voidable" by the principal, but it is not "void." 2A C.J.S. *Agency* § 163 (Nov. 2022 Update) ("Acts or transactions in excess of the agent's authority ordinarily do not bind the principal, subject to ratification by the principal, and are generally voidable but not void."); *id.* § 56 (same); 3 Am. Jur. 2d *Agency* § 164 (2d ed. & Nov. 2022 Update) (explaining that an agent's execution of a contract "that exceeds the scope of the agency" is "merely voidable, not void," and that "without the principal's subsequent ratification, the contract must be set aside").

Both state and federal courts applying state law have held an agent's lack of authority renders a contract voidable, not void. *See, e.g.*, *Reinagel v. Deutsche Bank Nat'l Tr. Co.*, 735 F.3d 220, 226 (5th Cir. 2013) (stating that, under Texas law, "a contract executed on behalf of a corporation by a person fraudulently purporting to be a corporate officer is, like any other unauthorized contract, not void, but merely voidable at the election of the defrauded principal"); *Fejta v. GAF Cos.*, 800 F.2d 1395, 1396 (5th Cir. 1986) (stating that, under Louisiana law, "a contract entered into by an agent, though voidable for lack of authority to act, may be ratified by the principal"); *Eaglebank v. BR Pro. Sports Grp., Inc.*, 649 F. App'x 209, 211 n.1 (3d Cir. 2016) ("[T]he effect of an officer exceeding the scope of his or her authority in entering into a contract is to make that contract voidable . . . ."); *Perri v. United States*, 53 Fed. Cl. 381, 401 (2002) (stating that when an official

makes an agreement without actual authority to bind the government, the resulting contract is "voidable at the option of the government" and citing Restatement (Second) of Contracts, *supra*, § 7), *aff'd*, 340 F.3d 1337 (Fed. Cir. 2003); *Stamatakos v. Wells Fargo Bank, Nat'l Ass'n*, 2018 WL 1441233, at *7 (D. R.I. Mar. 22, 2018) ("The law of Rhode Island is clear that, even if the signatory to an assignment (or other contract) lacks the proper authority, the assignment is rendered voidable rather than void."); *Sauers v. Bank of Am., N.A.*, 2013 WL 12108140, at *3 (W.D. Tex. Oct. 3, 2013) (explaining that the "lack of authority makes th[e] assignments merely voidable, not void"); *Deutsche Bank Tr. Co. v. Beesley*, 2012 WL 5383555, at *5 (D. Haw. Oct. 30, 2012) (concluding plaintiffs' challenge to assignment of their mortgage based on signing agents' lack of authority was a challenge to "a voidable, not void, contract"); *Scott v. United States*, 2011 WL 13308717, at *2 (M.D.N.C. June 2, 2011) ("[A]n agreement entered into by an unauthorized agent is a voidable, not void, agreement."); *Ristic Elec. LLC v. AH Holdings LLC Series A*, 2016 WL 4161966, at *10 (Ill. App. Ct. Aug. 4, 2016) (concluding a company agent's lack of authority to execute a deed "would merely render it voidable" and "the company may later ratify the contract"); *see also Roberson Advert. Serv., Inc. v. Winnfield Life Ins. Co.*, 453 So. 2d 662, 665 (La. Ct. App. 1984) (acknowledging that a contract entered by an agent is voidable for lack of authority).

While we do not apply state law here, we note these state law cases are consistent with the general void/voidable principles

established in the treatises and legal dictionary definitions, discussed above, which draw a demarcation more easily applied.

Applying these general principles here, we conclude that the written and facially valid security agreement, signed by Hardwick as agent and manager, created legal relations until it was avoided or ratified by agent Hardwick's principal. Hardwick's lack of authority, even if proven, would at most render the security agreement voidable.[8] And *Langley* teaches us that a failed bank has and can transfer a voidable interest or title in an asset to the FDIC, and that is enough to constitute an interest in the asset to trigger *D'Oench* protection of the FDIC. *See Langley*, 484 U.S. at 94, 108 S. Ct at 402.

Tellingly, Landcastle's brief argues only that the security agreement was "void," never mentions "voidable" contracts, and never acknowledges the void-voidable dichotomy. We readily reject Landcastle's argument that the security agreement, like a gambling contract or illegal bargain, was void, of no legal effect, nonexistent, and incapable of transfer. Rather, as Renasant and the amici agree, the security agreement was, at most, voidable and capable of transfer to the FDIC.

---

[8] Notably, before the FDIC took over Crescent, the Hardwick law firm took no steps to avoid the security agreement. After the FDIC took over and sold the security agreement, Renasant continued to hold the law firm's CD as collateral for five years. When Renasant notified the law firm of the loan default and CD liquidation, it received no response, much less any objection, from the law firm.

### C. Fraudulent Inducement Does Not Prevent Transfer of an Interest to the FDIC, and Neither Should Hardwick's Lack of Authority

Landcastle's attempt to categorically exclude lack-of-authority claims from *D'Oench* is also inconsistent with the broad equitable protection afforded the FDIC from claims based on evidence outside the bank's official records. As noted earlier, the Supreme Court has held that *D'Oench* protects the FDIC from even fraud-in-the-inducement claims and defenses. *Id.* at 93, 108 S. Ct. at 402 (holding that a claim based on the failed bank's fraud—that induced the borrower to borrow money and sign a note—was barred by *D'Oench* and § 1823(e)); *see McCullough*, 911 F.2d at 599–600 (holding that *D'Oench* bars fraud-in-the-inducement claims); *Twin Constr., Inc.*, 925 F.2d at 382 (stating the *D'Oench* doctrine broadly protects the FDIC and its successors "from claims of state and common law fraud").

Under *Langley*, a failed bank's *fraud against its own bank customer* renders the customer's note only "voidable" and does not prevent the bank from transferring title to or an interest in that customer's note to the FDIC for *D'Oench* purposes. By analogy, Hardwick's lack of authority also renders the security agreement at most "voidable" and capable of transfer to the FDIC.

Let's remember that *D'Oench* is an estoppel doctrine. We do not consider legal issues, such as lack of authority in this *D'Oench* setting, in the abstract or in a vacuum, but in the context of the factual circumstances presented in this case. Our decision as

to a legal issue can reach only as far as the factual circumstances frame the precise issue presented. *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010); *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006); *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003).

Three contextual facts surround Landcastle's lack-of-authority claims in this *D'Oench* setting: (1) at a minimum, Hardwick was an agent and manager of the Hardwick law firm; (2) the failed bank had no knowledge that Hardwick lacked authority to pledge the CD; and (3) Hardwick induced the bank to make a loan by securing it with his law firm's CD in the same amount of $631,276.71.

Under these circumstances, we reject Landcastle's argument that Hardwick's lack of authority prevented Crescent's transfer of an interest in the security agreement to the FDIC as receiver.

### D. Equities Protect the FDIC

Landcastle's approach—categorically excluding lack-of-authority claims from *D'Oench*'s prohibition of non-bank-records evidence—would defeat *D'Oench*'s equitable purposes.

Our thorough review of *D'Oench* precedent above demonstrates that courts consistently have applied *D'Oench* as a federal equitable doctrine that protects the FDIC as receiver from a broad array of claims and defenses to a facially valid and unconditional note, guaranty, or collateral pledge acquired by the FDIC from a failed bank. *See, e.g., Langley*, 484 U.S. at 92–93, 108

S. Ct. at 401–02 (protecting the FDIC from claims raising "undisclosed conditions" and "fraud in the inducement"); *McCullough*, 911 F.2d at 601–02 (protecting the FDIC from "defenses of failure to perform a condition precedent, failure of consideration, and fraudulent inducement"); *Twin Constr., Inc.*, 925 F.2d at 382 (protecting the FDIC "from claims of state and common law fraud, violation of state or federal securities laws, and the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration and usury").

Landcastle's lack-of-authority claims pale in comparison to the severity of the other types of claims already held barred by *D'Oench*'s *prohibition of non-bank-records evidence*. These claims already barred by *D'Oench* nonetheless provide a close analog, certainly a much closer analog than anything Landcastle or the dissent proposes.

Think about this, too. Landcastle's categorical approach would mean every facially valid and unconditional bank transaction assumed and sold by the FDIC as receiver can now be subjected to exhaustive litigation by alleging that a manager or officer of a business lacked authority to enter into the transaction. As here, a manager or officer often does have considerable authority to handle the affairs of the business but may allegedly exceed that authority in a particular transaction.

Yet under Landcastle's proposed categorical rule, when deciding whether to sell or liquidate a failed bank, the FDIC would no longer be able to rely on the bank's official records but would

20-13735                Opinion of the Court                47

have to look beyond the plain terms of each and every note, guaranty, or security agreement and investigate whether each party in each transaction in fact possessed the precise authority to execute a particular agreement that their signature and title imply. That is precisely the burden of which the *D'Oench* doctrine relieves the FDIC when it must quickly sell a failed bank in order to provide customers' access to their deposits without interruption and protect the federal funds it administers. The FDIC's ability to rely on the official failed bank records is the purpose of *D'Oench*'s federal estoppel doctrine.

Here, in taking over and selling Crescent's assets to Renasant, the FDIC was entitled to rely on Crescent's official records, which contained the unqualified and facially valid security agreement pledging a CD for $631,276.71 as collateral for a $631,276.71 loan. Barring under *D'Oench* Landcastle's lack-of-authority claims—based on non-bank-records evidence—properly allocates the risk to the principal (MHSLAW, P.C. and the law firm) who hired Hardwick—as its President, director, and manager—rather than to the FDIC as receiver of a failed bank.[9] Severing Hardwick's lack of authority from his fraudulent inducement of the

---

[9] Indeed, the law firm failed to give Crescent its corporate governance documents that limited Hardwick's authority as President and Director of MHSLAW, P.C., or as Manager of his law firm. By doing so, the law firm lent itself to an arrangement—the purchase of a CD for $631,276.71 and a loan for $631,276.71 collateralized by the CD—that would tend to mislead the bank examiners and the FDIC.

bank would favor the interests of borrowers over the interests of depositors by shifting, in the context of FDIC receivership, the risk of internal corporate-governance problems from the business entity (here a law firm) to the FDIC.

As the Supreme Court emphasized in *Langley*, the equities that the *D'Oench* doctrine regards as predominant are those protecting the FDIC. 484 U.S. at 94–95, 108 S. Ct. at 403. We need go no further than rejecting Landcastle's attempt to exclude its lack-of-authority claims—which are based on non-bank records—from *D'Oench*'s estoppel doctrine.

## VI.    RESPONSE TO THE DISSENT

The bulk of the dissent is not about *D'Oench* cases but is a discussion of different agency and contract principles. Dissenting Op. at 14–36. The dissent insists we create a "radical" new rule that an agent without authority *binds* its principal in contract. *Id.* at 1, 10, 36–38. The dissent uses various forms of the word "bind" 55 times. But that is not what we rule, say, or intend to do here.

### A. Agreement on Basic *D'Oench* Principles

Before addressing the core dispute, let's list *D'Oench* principles the dissent does not dispute:

(1) the *D'Oench* doctrine protects the FDIC from claims or defenses based on evidence outside the failed bank's records, Dissenting Op. at 1, 11;

(2) the *D'Oench* doctrine applies when the claim or defense based on outside evidence "tend[s] to diminish or defeat" the FDIC's interest in an asset of the failed bank, *id.* at 11;

(3) the *D'Oench* doctrine protects only interests the failed bank already had at the time of the takeover; it does not create new interests, *id.* at 12; and

(4) a "voidable" contract is enough to constitute an interest that is transferable to the FDIC, and the *D'Oench* shield would bar claims that seek to defeat a "voidable" contract, *id.* at 13–14.

What the dissent does hotly dispute is that the security agreement was voidable. Our core dispute is over whether for *D'Oench* purposes the security agreement was (1) automatically void, a nullity, and non-existent at execution, or (2) merely voidable by the law firm at its option and transferable.

Deciding this case does not require the dissent's lengthy debate about agency and contract principles. *See id.* at 14–36. Rather, this case can be narrowly decided using the void-voidable dichotomy for *D'Oench*-transfer purposes. As discussed in Section

V.B., the general definitions of void and voidable found in treatises and legal dictionaries draw a clear demarcation easily applied to this case. The security agreement was not an illegal contract; it did not contravene a statute or violate public policy. Under *Langley*, it was a facially valid, unqualified agreement, held by Crescent and transferable to the FDIC.

The dissent tries to expand the issues and make this case about whether the law firm was *bound* by that contract. The bulk of the dissent is under this heading: "An Agent Without Authority Cannot Bind a Principal in Contract." *Id.* at 14–36. The dissent argues that no binding contract was formed because Hardwick lacked authority, and Crescent had nothing to transfer.

Here, though, we need not, and do not, decide what evidence would have been allowed if Crescent had not failed and the law firm challenged the enforceability of the agreement. What *D'Oench* precludes is not the challenge itself, but the law firm's (now Landcastle's) use of documents *outside the failed bank's official records* to mount that challenge.

It is undisputed that Landcastle's lack-of-authority claims are *based on non-bank records*. Accordingly, our holding, as already stated, is:

> Applying the Supreme Court's and our Circuit's *D'Oench* precedent, we hold that Landcastle's lack-of-authority claims are barred because they rely on evidence that was *outside Crescent's records* when

20-13735                Opinion of the Court                51

> the FDIC took over that failed bank and sold the
> Hardwick loan and CD collateral to Renasant.

Majority Op. at 5, 33.

It's hard to know what to respond to and what to ignore because the dissent strays so far afield from the narrow *D'Oench* path that decides this case. Yet the dissent cannot go wholly unanswered because it asserts that the majority (1) relies on a "radical . . . interpretation of agency law" that allows the FDIC to "steal assets from third parties when it takes over a failed bank," (2) "creates serious Takings Clause concerns," (3) adopts a "new rule" that "greatly disrupts commercial relationships" in Georgia, and (4) fails to get the message of the Supreme Court and three sister Circuits that "the Deposit Corporation cannot acquire an interest that is void before the Deposit Corporation purports to acquire it." Dissenting Op. at 1–2, 40, 42, 47.

Oh my goodness. "[L]ike most apocalyptic warnings," the dissent "proves a false alarm." *Epic Sys. Corp. v. Lewis*, 584 U.S. —, 138 S. Ct. 1612, 1630 (2018).[10] Nonetheless, given the dissent's accusations, we must respond and do so in seven parts.

---

[10] As to the Takings Clause, the dissent accuses the majority of "licens[ing] governmental theft" and "creat[ing] serious constitutional problems without any discussion." Dissenting Op. at 47. We do not discuss the Takings Clause because Landcastle never mentioned it in the district court or in its appellate briefs. That's why the dissent resorts to suggesting that "Landcastle should be free on remand" to raise a Takings Clause claim. *Id.* at 43.

First, we address three *D'Oench* decisions that the dissent cites to charge we failed to get the message of our sister circuits. Dissenting Op. at 14, 46–47. Those cases support our ruling, not the dissent.

Second, we refute the dissent's groundless accusation that we "greatly disrupt[] commercial relations" in Georgia. *Id.* at 40.

Third, we reply to the dissent's baseless charge that we invent a new rule and rely on "a radical" interpretation of agency law that allows the FDIC to "steal assets from third parties." *Id.* at 1. We explain how contracts are formed by agents, and how if an agent exceeds his authority, the principal (here, the law firm) always has the option to reject or affirm that contract, which renders the contract voidable, not void. No radical ideas here.

Fourth, we respond to the dissent's no contract or void contract arguments. *Id.* at 14–36. None of the dissent's authorities, including the three cited Eleventh Circuit cases, involve failed banks, *D'Oench* issues, or whether a contract is void or voidable for *D'Oench* transfer purposes. Rather, the cases involve whether a principal was *bound* by an agent's unauthorized act. The dissent also relies on conflicting state law, which we view as unnecessary and unwise to unravel.

Fifth, we address the dissent's cites to Federal Arbitration Act ("FAA") cases that are not on point.

Sixth, we discuss how the security agreement was ratifiable and thus voidable and why the dissent's void-contract claim is incorrect.

Seventh, we explain why the Restatement comments the dissent cites do not support its argument that the security agreement was void.

### B.    Dissent's Claim that Three Other Circuits "Got the Message" that the "Majority Misunderstands"

The dissent alleges "[t]he majority misunderstands the *D'Oench* doctrine, even though . . . at least three of our sister circuits got the message:  the Deposit Corporation cannot acquire an interest that is void before the Deposit Corporation purports to acquire it." *Id.* at 47 (citing *Fed. Deposit Ins. Corp. v. Bracero & Rivera, Inc.*, 895 F.2d 824, 830 (1st Cir. 1990); *Grubb v. Fed. Deposit Ins. Corp.*, 868 F.2d 1151, 1158 (10th Cir. 1989); *Andrew D. Taylor Tr. v. Sec. Tr. Fed. Sav. & Loan Ass'n*, 844 F.2d 337, 342–43 (6th Cir. 1988) (*"Taylor Trust"*)); *see id.* at 14 (citing same).  The dissent claims these cases show the security agreement here was void and not transferable.  These cases support our ruling, not the dissent.

The dissent summarily dismisses the fact that these cases concerned bank assets that were already voided by a court judgment, paid, or fully extinguished *before the FDIC took over as receiver*.  That total cancellation of the asset before the takeover is what precluded the FDIC from acquiring an interest in the contract.    In stark contrast, here there was no change to,

cancellation of, or diminishment of the security agreement before the FDIC took over.

In *Grubb*, for instance, the Tenth Circuit held that the FDIC could not "claim the protection of *D'Oench*" because, *before* the bank in that case failed, i.e., before the FDIC took over as receiver, *the district court had entered a judgment for the plaintiff and explicitly "voided" the asset at issue.* 868 F.2d at 1158–59. Here, if the Hardwick law firm had sued Crescent while the bank was still solvent, and a court had entered judgment voiding the 2009 security agreement before the FDIC took over as receiver in 2010, then Crescent would not have had a transferrable interest in the security agreement when it failed. The Hardwick law firm did not challenge the 2009 security agreement before the FDIC took over *or during the next seven years.* For over five years Renasant Bank held the law firm's CD as collateral and liquidated it in 2014—all without objection by the law firm. The law firm's actions belie the dissent's claims of no transferable interest. It was only in 2017 that Landcastle (who bought potential claims in the law firm's bankruptcy) challenged the 2009 security agreement.

The dissent's next case—*Bracero & Rivera*—also supports our holding. The First Circuit held that *D'Oench* did not apply to a canceled mortgage note in the bank's records *before* the FDIC took over. 895 F.2d at 829–30. The First Circuit concluded that the *D'Oench* doctrine did not apply because (1) "the note was discharged by the payment and cancellation of the underlying debt before [the] FDIC ever obtained it," and (2) bank documents

evidencing that discharge and cancellation "were in the hands of [the] FDIC *at all relevant times*." *Id.* The note was paid and not an asset protected by *D'Oench* or § 1823(e). *Id.* at 830.

Just the opposite is true here. The security agreement was never challenged—much less canceled—before the FDIC took over, and Landcastle's challenge came seven years later. That the dissent resorts to *Grubb* and *Bracero & Rivera* to discredit the majority reveals how baseless the dissent's accusations are.

Likewise, *Taylor Trust* does not help the dissent because the Sixth Circuit held the agent trustee acted with authority. Taylor was the trustee of his minor son's savings account. *Taylor Tr.,* 844 F.2d at 339. However, Taylor, as president of Security Trust, executed collateral agreements pledging, *inter alia*, his minor son's savings-account trust. *Id.* Taylor executed the pledge agreements to secure advances made by Security Trust to two Hawaiian real estate ventures under lines of credit. *Id.* at 340. After Taylor was discharged as president and both Hawaiian real estate ventures defaulted, Security Trust claimed the pledged accounts. *Id.* The minor's savings-account trust then sued Security Trust to have the pledge agreements declared invalid, arguing that Taylor lacked authority to pledge the minor's trust. *Id.* at 340, 343. While the action was pending, Security Trust was declared insolvent, and the FSLIC took over as receiver. *Id.* at 340.

The Sixth Circuit summarized the trust's *argument* that because Taylor lacked authority to pledge his son's trust, the pledge agreements were void ab initio, taking them out of the

*D'Oench* doctrine. *Id.* at 342–43. The Sixth Circuit did not decide that issue because it concluded that Taylor had the authority to revoke the minor's trust. *Id.* at 344. Thus, the Sixth Circuit concluded *D'Oench* applied, and the FSLIC prevailed. *Id.*[11]

### C. Dissent Misstates Georgia Law

As discussed later, the dissent largely cites state cases and federal diversity cases—applying applicable state law—to support its proposition that the security agreement was void because no contract is ever formed when an agent lacks authority. As part of that argument, the dissent alleges: "Georgia law dictates that lack of authority prevents contract formation," and therefore "the majority's new rule greatly disrupts commercial relationships." Dissenting Op. at 40. That is not Georgia law, nor what we do here.

In claiming an agent's lack of authority always prevents contract formation, the dissent cites four Georgia cases and O.C.G.A. § 10-6-51. *Id.* at 40–41. *See Hagan v. Asa G. Candler, Inc.*, 5 S.E.2d 739 (Ga. 1939); *Lynn v. Lowndes Cnty. Health Servs., LLC,* 840 S.E.2d 623 (Ga. Ct. App. 2020); *Berger v. Ga. Power Co.*,

---

[11] In a parenthetical, the dissent notes that *Taylor Trust* "stat[ed], though in dicta, that an agent's lack of authority . . . renders the contract void *ab initio*, rather than merely voidable." Dissenting Op. at 36 (quotation marks omitted). That was not even dicta. The Sixth Circuit was merely reciting the party's argument, not opining itself. *Taylor Tr.,* 844 F.2d at 342–43. *Taylor Trust* did not explore the differences between void and voidable agreements. There was no reason to do so because it concluded Taylor had authority to act.

49 S.E.2d 668 (Ga. Ct. App. 1948); *Buena Vista Loan & Sav. Bank v. Stockdale*, 192 S.E. 246 (Ga. Ct. App. 1937).

Those Georgia cases relied on by the dissent have nothing to do with the contract-formation issue here. The *Berger* and *Buena Vista* cases involved (1) the *endorsements of checks* and not formation of a contract between two parties, (2) the effect of a third party's unauthorized signature *endorsement on a check* under a former Georgia statute, and (3) whether the third party's *endorsements* were forged or genuine. *See Berger*, 49 S.E.2d at 669; *Buena Vista*, 192 S.E. at 247. Plus, neither case involved an agent, much less one who exceeded his authority.

Contrary to the dissent, Georgia law recognizes that an agent routinely forms a contract on a principal's behalf, and if an agent acted without authority, the principal may either repudiate or ratify that contract. *See, e.g.*, O.C.G.A. § 10-6-51 ("The principal shall be bound by all the acts of his agent within the scope of his authority; *if the agent shall exceed his authority, the principal may not ratify in part and repudiate in part; he shall adopt either the whole or none.*" (emphasis added)).

Further, *Lynn* and *Hagan*, the dissent's agency law cases, do not support the dissent's no-contract-formed or void-contract argument. The Georgia court in *Lynn* explained that, under Georgia law, where the principal is fully informed of the agent's unauthorized act and does not repudiate it *within a reasonable time*, ratification is presumed and takes effect as if originally authorized. 843 S.E.2d at 631. The *Lynn* court did not mention

the terms "void" or "void contract." And the *Lynn* court ultimately concluded that the principal, a mentally disabled, 50-year-old man with Down Syndrome who could not read, write, or speak, was incapable of forming an agency relationship with his mother. *See id.* at 628–31. Here though, Hardwick was an admitted agent of his law firm and for years the law firm's CD was held and then liquidated without objection of the law firm. *Lynn* is wholly inconsistent with the dissent's interpretation of Georgia law.

*Hagan* also does not help the dissent because the alleged principal there was non-existent. 5 S.E.2d at 740. The issue was whether "an agent who executes a contract on behalf of a non-existent principal is himself liable on the contract." *Id.*

Instead, as discussed before, the more informative case as to void contracts is our *Griffin* decision applying Georgia law. In *Griffin*, this Court expressly addressed whether assignments of certain benefits were void or "merely voidable," where the assignors' benefit plans contained an anti-assignment provision. *Griffin*, 989 F.3d at 934 (11th Cir. 2021). We observed that whereas void contracts are "[o]f no legal effect" and "void," voidable contracts are "[v]alid until annulled." *Id.* at 934 & n.6 (quoting Black's 2019 definitions of void and voidable).

We held the assignments were "merely voidable" because they were not illegal, did not contravene public policy, and had nothing to do with gambling—the three "void" contracts under Georgia law. *Id.* at 934 (citing O.C.G.A. §§ 13-8-1, 13-8-2, 13-8-3).

*Griffin* is instructive. First, *Griffin* observed that, unlike void contracts, voidable contracts are valid until annulled. *Id.* at 934 & n.6. Second, *Griffin* demonstrates that the security agreement here was not a void contract under Georgia law because it was not illegal, did not contravene public policy, and had nothing to do with gambling. *See id.* at 934.

Tellingly too, the Georgia Supreme Court held in *Holden* that *D'Oench* protects the FSLIC as receiver from a property owner's claim based on non-bank records that a partner *lacked authority* to pledge a security interest in the partnership's property. 485 S.E.2d at 483 (applying federal common law). The Georgia Supreme Court reasoned that invalidating the agreement in *Holden* would strip away the *D'Oench* doctrine's protection of bank depositors, bank authorities, and guarantors. *Id.* This reasoning is equally applicable to the case at bar: Invaliding the security agreement defeats *D'Oench*'s equitable purposes and protects Landcastle and the Hardwick law firm at the expense of bank depositors, bank authorities, and guarantors. Therefore, the dissent's allegation that we "greatly disrupt[] commercial relationships" in Georgia is wholly unfounded. Dissenting Op. at 40.[12]

---

[12] Speaking of commercial relationships, banks fail, the FDIC sells them overnight to successor banks like Renasant, who open them the next day without interruption. For years, Hardwick made his loan payments to Renasant but then defaulted, and Renasant liquidated the CD collateral. Landcastle now, many years later, wants to use parol evidence—outside the

### D. How Contracts Are Formed by Agents

Next, we respond to the dissent's charge that we invent a new, radical agency rule.  This accusation also is baseless.

To set things straight, general agency principles recognize that there can be (1) "agents" who have some actual authority from a principal but may act outside of it or outside of their apparent authority; (2) other actors who appear to third parties to be "agents" but who lack any actual authority and therefore are not "agents" for the principal at all; and (3) persons, either agents or actors purporting to be agents, whose acts can be ratified by the principal such that "the act is given effect as if done by an agent acting with actual authority."  Restatement (Third) of Agency, §§ 3.01, 3.03, 4.01(1), 4.03 (Am. L. Inst. 2006).

According to the certified question, Hardwick was the law firm's "agent."  He was not merely an actor appearing or purporting to be an agent.  No one disputes that Hardwick was an agent of both the law firm (as a manager) and MHSLAW, P.C. (as President and a director).  Therefore, we look first to those agency principles applicable to "agents."

It is a "basic principle that when an agent enters into a contract on behalf of a disclosed principal, the principal and the third party are parties to the contract.  A principal is disclosed when

---

failed bank's records—to set aside the 2009 security agreement.  That's what would be disruptive.

the third party has notice that an agent is acting for a principal and has notice of the principal's identity." *Id.* § 6.01 cmt. a.

A valid contract requires "a bargain in which there is a *manifestation of mutual assent* to the exchange and a *consideration*." Restatement (Second) of Contracts, *supra*, § 17(1) (emphases added); 1 Williston on Contracts, *supra*, § 3:2 (same). Mutual assent and consideration are required elements for contract formation. In the agency context, however, it is the agent who manifests the assent to the exchange with the third party, not the principal. Restatement (Third) of Agency, *supra*, § 6.01 cmt. b ("An agent enters into a contract on behalf of the agent's principal by manifesting assent to an exchange that constitutes valid consideration."). The principal does not manifest the assent to the exchange because that is the agent's job. *See id.* A contract is formed upon the agent's manifestation of assent to the exchange on the principal's behalf.

Whether the contract so formed by the agent later subjects the principal to liability (i.e., binds the principal) or later is voidable by the principal is a separate legal matter. As discussed earlier, if it turns out the agent was acting outside the scope of his authority when he manifested assent to the exchange with the third party, the resulting contract is voidable by the principal, not entirely "void."

At the risk of beating a dead horse, an agent who lacks authority merely forms a contract that is voidable at the option of the principal. A voidable contract is not the same as a binding

contract.  Whether a voidable contract ultimately will be binding is a decision for the wronged party in the transaction.  Upon notice of the contract, the principal has the power to either ratify and be bound by it or disaffirm and avoid it.  And the contract becomes either enforceable or unenforceable against the principal upon the principal's exercise of this power.

For *D'Oench* purposes, the fact that the principal retains this power to ratify or disaffirm means the contract formed by the agent is merely "voidable," and not void at inception.  That distinction matters because *D'Oench* recognizes voidable interests are transferrable from the failed bank to the FDIC.

### E.  Dissent's No Contract or Void Contract Arguments

In an attempt to escape *D'Oench* altogether, the dissent claims the security agreement is no contract or a void contract.[13] Dissenting Op. at 14–36.

---

[13] Specifically, the dissent argues: (1) that because "an agent *cannot bind* a principal in contract when he lacks the authority to do so," the "resulting purported contract is void"; (2) "for present purposes, there is no meaningful difference between saying that the agent formed no contract" or "formed a void contract"; and (3) "[n]o contract is formed between the principal and the third party because a principal *is not subject to liability* when an agent acts without authority."  Dissenting Op. at 16–19, 25 (emphases added) (quotation marks omitted).  The dissent frames the issue as whether there is a binding contract or whether the principal is bound and subject to liability.  Once again, that's a very different issue than whether the bank had an interest in the security agreement, even if voidable, that was transferable to the FDIC.

First, the dissent states that "when an agent purports to 'enter[] into [a] contract on [its] principal's behalf . . . without actual or apparent authority,' the 'principal is not a party to [that] contract.'" *Id.* at 16 (alterations in original) (emphasis omitted) (quoting Restatement (Third) of Agency, *supra*, § 6.05 cmt. b).

That quoted comment b to § 6.05, however, addresses only the circumstances under which the principal "*is subject to liability*" when the agent makes a contract with a third party that is unauthorized in part. Restatement (Third) of Agency, *supra*, § 6.05(1) & cmt. b (emphasis added). Comment b speaks to *the principal's liability* under the contract the agent makes, not to whether a contract was formed in the first place or the effect of an agent's lack of authority on the formation of a contract. *See id.*

Next, the dissent cites three Eleventh Circuit cases for its no contract or void contract argument. Dissenting Op. at 17–19, 31–32 (citing *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299 (11th Cir. 2017) ("*GDG*"); *In re JLJ Inc.*, 988 F.2d 1112 (11th Cir. 1993) ("*JLJ*"); *Gymco Constr. Co. v. Architectural Glass & Windows, Inc.*, 884 F.2d 1362 (11th Cir. 1989) ("*Gymco*")). By taking these cases wholly out of context, the dissent makes it appear they apply here, but they do not. We therefore must discuss these cases in detail. As we shall see, none of these precedents involve application of the *D'Oench* doctrine, none discuss the void-voidable dichotomy, all are materially and easily distinguishable, and one actually supports our position.

### Gymco v. Architectural Glass

The dissent relies heavily on our 1989 *Gymco* decision, applying Georgia law, but, unlike the Georgia Supreme Court's 1997 *Holden* decision, *Gymco* did not involve a failed bank, the FDIC, or *D'Oench*. In any event, *Gymco* is about whether the principal *was bound* by its agent's *oral contract* when the other party to the contract *knew* the agent lacked authority.

In *Gymco*, a written contract between Gymco Construction ("Gymco") and Architectural Glass & Windows ("AGW") required AGW to install a glass façade for Gymco. 884 F.2d at 1363. Gymco knew that AGW's President signed the written contract, submitted all the pay orders, and negotiated the conditions. *Id.* at 1366. Yet Gymco claimed that Young, a sales representative for AGW, *orally agreed* to substitute stainless steel, and Gymco sued AGW when it refused to provide a stainless steel façade. *Id.* at 1364–65.

On appeal, this Court held that AGW was not liable for damages to Gymco because (1) Young lacked actual authority to enter a new oral contract for steel; and (2) it was *unreasonable* for Gymco to assume Young had authority because it was AGW's President who had demonstrated his complete authority over the contract terms. *Id.* at 1366. We explained: "The evidence of the parties [sic] dealings makes clear that Gymco knew that Young only had limited authority." *Id.* at 1367. We stressed that substituting stainless steel for glass would be enforcing a new oral contract with "a materially different obligation," and because "Young lacked the authority to enter into a new contract obligating

AGW to install the stainless steel," we held that "there was no oral contract between Gymco and AGW." *Id.* at 1365–67.

We also rejected Gymco's argument that Young could *orally agree* to modify the written contract given that the contract required modifications to be in writing. *Id.* at 1367. We also pointed out that AGW had "repudiated" Young's oral agreement to provide steel in lieu of glass as soon as it learned of it and terminated Young immediately. *Id.* at 1364, 1366.

So that's the case. Now let's look at how the dissent uses *Gymco* wholly out of its context. The dissent cites *Gymco* for this purported principle: "that because an agent 'lacked authority to enter into a . . . contract' between his principal and a third party, 'there was no [such] contract.'" Dissenting Op. at 17 (alterations in original). The first quote leaves out the word "oral," and the latter quote changes "there was no oral contract" to "there was no [such] contract." *Gymco* involved an oral contract that the third party knew the agent lacked authority to enter and that the principal promptly repudiated. These facts alone are sufficient reasons to discard it.

*Gymco* is further materially distinguishable because there is no analysis of contract-formation principles, much less contract formation by an agent where: (1) the agent executed a facially valid *written* contract, with plain and clear terms; (2) the agent who signed for the principal was its President, manager, and director; and (3) the other party (Crescent) undisputedly had no knowledge of any limits on the officer's authority. Significantly, too, *Gymco*

was about whether AGW *was bound* by Young's oral acts when Gymco knew he lacked authority. To repeat ad nauseam, whether the principal law firm was bound by agent Hardwick's acts is not the narrow issue here.

*Gymco* never used the word "void." *Gymco* did not suggest, much less hold, that Young's oral agreement was a void contract, as the dissent implies. *Id.* *Gymco* is but one example of how the dissent's cites do not support the proposition offered. *Holden*, not *Gymco*, is relevant here.

### In re JLJ Inc.

The dissent argues *JLJ* is relevant because it shows an agent lacking authority "cannot bind a principal in contract" and "the resulting purported contract is void." *Id.* at 18–19. Of course, the inquiry in JLJ was whether the contract was *binding* on the principal. *JLJ* did not address the void-voidable dichotomy or even mention the term voidable. Also, *JLJ* did not involve a failed bank, the FDIC, or *D'Oench*. Here's what happened.

In a bankruptcy adversary proceeding, Karen Rush and her estranged husband's company RBC both claimed they owned the debtor's note. 988 F.2d at 1115. Her husband had Karen's power of attorney and assigned the note to RBC. *Id.* The issue was whether the assignment contract was valid against Karen. *Id.* at 1116. The bankruptcy court awarded the note to RBC, but the district court reversed and entered judgment for Karen, finding she had impliedly revoked the power of attorney. *Id.* at 1114–15.

This Court vacated the district court's judgment and remanded for the bankruptcy court to make factual findings regarding whether Karen had orally revoked the power of attorney *before* her husband assigned the note. *Id.* at 1117. Applying federal procedural rules, our Court held that the district court "exceeded the proper scope of review" and invaded "the province of the bankruptcy court as the trier of fact" when it "independently found that Karen's and Edward's estrangement impliedly revoked the power of attorney." *Id.*

We reasoned that "[i]f Karen orally revoked the power of attorney when she fled [her husband] Edward's threats of violence, then the assignment Edward executed one week later would be void." *Id.* at 1116.

We conclude *JLJ* is not instructive here. First, the validity of the assignment in *JLJ* involved substantive Alabama law. *See id.* at 1116–17.[14]  Second, and in any event, the *JLJ* Court did not address

---

[14] We know that the *JLJ* Court applied substantive Alabama law because both our Court and the bankruptcy court cited Alabama law. *See JLJ*, 988 F.2d at 1116–17; *In re JLJ, Inc.*, 115 B.R. 324, 333 (Bankr. N.D. Ala. 1990) (applying Alabama law to determine whether Karen revoked the power of attorney). It is well settled that "[t]he interpretation of private contracts is ordinarily a question of state law" and "[t]he substantive law of the forum state [Alabama here] governs issues of state law that arise in bankruptcy proceedings." *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009) (quotation marks omitted); *see In re Northington*, 876 F.3d 1302, 1310 (11th Cir. 2017) ("Even in the uniquely 'federal' bankruptcy context, '[p]roperty interests are created and defined by state law.'" (alteration in original) (quoting *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979))). The dissent acknowledges *JLJ* expressly

the issue presented in this case: whether an agreement entered by an agent without authority is void or merely voidable.

Third, our Court, albeit in an unpublished opinion, recently singled out Alabama court decisions for using the word "void" imprecisely, including when the court means a contract is voidable. *See United States v. Ruan*, 796 F. App'x 672, 675–76 (11th Cir. 2020). Our Court observed that "Alabama 'judges and text-book writers have frequently used the words voidable and void indiscriminately'" when referring to contracts. *Ruan*, 796 F. App'x at 675 (quoting *Ex parte Banks*, 64 So. 74, 75 (Ala. 1913)).

Fourth, many have lamented that courts imprecisely use "void" where "voidable" is meant. For example, Black's Law Dictionary has explained that "[t]he distinction between *void* and *voidable* is often of great practical importance," and although the "strict meaning of *void*" is "[o]f no legal effect," "the word [void] is often used and construed as bearing the more liberal meaning of 'voidable.'" *Void*, Black's Law Dictionary (11th ed. 2019); *see also Void Contract*, Black's Law Dictionary (11th ed. 2019) (again acknowledging that "the word 'void' has been used, even by judges and the framers of statutes, where 'voidable' is meant").

---

relied on Alabama law "to determine under what circumstances the power of attorney could be revoked," but the dissent attempts to separate from Alabama law *JLJ*'s statement the contract would be void if the agent's power of attorney was revoked. Dissenting Op. at 19. However, the entire question as to the validity of the assignment in *JLJ* involved substantive Alabama law, meaning that *JLJ* is not instructive here.

This is not a new phenomenon.  *See Ham v. Blankenship*, 194 F.2d 430, 432 (5th Cir. 1952) (observing a "lack of preciseness" in the use of the word void, which causes confusion generally); *Haggart v. Wilczinski*, 143 F. 22, 27 (5th Cir. 1906) ("The word 'void' is so often used in the sense of 'voidable' . . . ."). Recently, our Court pointed out the imprecise use of void where voidable is meant.  *See Griffin*, 989 F.3d at 934 & n.7 (11th Cir. 2021).

For these reasons, *JLJ* is not helpful guidance here.

### GDG v. Government of Belize

The dissent's final case from this Circuit is *GDG*.  The dissent argues *GDG* shows an agent's unauthorized contract is "void" until ratified.  Dissenting Op. at 31.  *GDG* hurts, not helps, the dissent.  *GDG* supports our conclusion that a contract entered by an agent without authority is <u>not</u> "void" ab initio.

*GDG* involved a contract dispute between the government of Belize and a company leasing equipment.  849 F.3d at 1302.  A Belizean minister executed a lease waiving sovereign immunity. *Id.* at 1302–03.  When GDG sued Belize for rent, Belize argued its minister lacked authority to waive immunity.  *Id.*  at 1302. Applying agency ratification principles, this Court concluded Belize ratified its minister's actions by performing, making payments, and retaining equipment.  *Id.* at 1302, 1312.

Importantly, we rejected Belize's argument that the lease was "void *ab initio*" and could not be ratified.  *Id.*  at 1310.  We stated Belize "misapprehend[ed] the nature of ratification," which

"starts with the assumption that the agent did not have actual authority at the time he acted." *Id.* Therefore, it was "of no moment" that the minister lacked authority when he entered the agreement. *Id.*

*GDG* is entirely consistent with our reasoning here. Specifically, *GDG* reasoned that even if an agent enters a contract without authority, that contract is not void ab initio because the principal can ratify the contract.

Contrary to the dissent's claims, our Court did not "recognize[] that a contract entered by an agent who lacked authority initially ha[s] no legal effect on the principal, but the principal [is] empowered to ratify it later." Dissenting Op. at 32. Quite the opposite. We rejected Belize's argument that the lease was "void *ab initio*" and could not "be enforced against [it] under a ratification theory." 849 F.3d at 1310 (quotation marks omitted). Nothing in *GDG*'s reasoning suggested, much less held, that the lease was "initially" void and somehow rendered not void by Belize's ratification.

### Other Federal and State Court Cases Cited by the Dissent

In Section V.B, we cited many state law decisions holding that a contract signed by an agent without authority makes that contract merely voidable at the election of the principal, but not void. However, we recognize that the dissent cites other state court cases, a Fifth Circuit case applying Mississippi law, and a First Circuit case applying Puerto Rico law for the inverse proposition

that a contract signed by an agent without authority is void. Dissenting Op. at 20–21.

Candidly, both we and the dissent are citing conflicting, but non-binding, state court and federal cases applying state law. And we appreciate the dissent's frankness in observing that agency law in this area is not a model of clarity, not always precise, and easily gives rise to confusion. *Id.* at 15, 27, 30, 32.

Given this landscape and that *D'Oench* is a federal estoppel doctrine, it is unnecessary and unwise to take on the difficult, if not impossible, task of reconciling this divergent state agency law.

Instead, in deciding this case, we rely on: (1) *Langley*'s holding that *D'Oench* bars evidence outside the bank's records because even fraud in the inducement renders a contract merely voidable, not void, and transferable to the FDIC; (2) our own well-developed circuit precedent squarely applying the *D'Oench* parol-evidence-like bar to a broad array of claims and defenses to a facially valid and unconditional note or collateral pledge acquired by the FDIC from a failed bank; and (3) the general definitions of "void" and "voidable" found in treatises and legal dictionaries, as discussed earlier, which demonstrate that the security agreement was a voidable contract. To repeat, Landcastle's lack-of-authority claims based on non-bank records pale in comparison to the severity of other types of claims this Court has held subject to *D'Oench*'s prohibition on non-bank-records evidence. Our

*D'Oench* precedent on those claims provides a much closer analog than anything the dissent proposes.[15]

### F. Federal Arbitration Act Cases

Although the parties' briefs do not discuss any arbitration cases, the dissent tries to employ FAA cases as "informative." Dissenting Op. at 21. The cases are not on point or instructive.

The dissent's reliance on *Buckeye Check Cashing, Inc. v. Cardegna* is misplaced because the Court declined to address whether an arbitration agreement is valid when the signor lacked authority to commit the principal. 546 U.S. 440, 444 n.1, 126 S. Ct. 1204, 1208 (2006) ("Our opinion today . . . does not speak to . . . whether the signor lacked authority to commit the alleged principal . . . ."); *see also Rintin Corp., S.A. v. Domar, Ltd.*, 476 F.3d 1254, 1259 (11th Cir. 2007) (recognizing that the Supreme Court in *Buckeye Check Cashing, Inc.* "deemed irrelevant" the distinction between void and voidable contracts). Our decision in *Chastain v. Robinson-Humphrey Co.*, also relied upon by the dissent, provides no guidance here, as the parties in that case *agreed* the appellee never signed the arbitration clauses at issue—a situation akin to fraud in the factum that would render a contract void. 957 F.2d

---

[15] We already know from *D'Oench* itself and our *McCullough* precedent that the *D'Oench* estoppel doctrine bars even a failure of consideration claim if *based on non-bank records*. *See D'Oench*, 315 U.S. at 456, 460–61, 62 S. Ct. at 679, 681; *McCullough*, 911 F.2d at 601–02.

851, 853, 855 (11th Cir. 1992), *abrogated on other grounds by First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920 (1995).

We need not wade into the quagmire of FAA law to recognize a fundamental difference between this case and the FAA cases cited by the dissent. For *D'Oench* purposes, we must determine whether the FDIC had an *interest* (including a voidable interest) that could be diminished or defeated. *See Langley*, 484 U.S. at 92–93, 108 S. Ct. at 401–02. In the arbitration context, however, courts look at whether an arbitration agreement is *binding* on the principal. *See, e.g.*, *Nat'l Fed'n of the Blind v. Container Store, Inc.*, 904 F.3d 70, 79–80 (1st Cir. 2018) ("A party seeking to compel arbitration must demonstrate that . . . the other party is *bound* by th[e arbitration] clause . . . ." (emphasis added and quotation marks omitted)). The dissent's FAA cases, therefore, have no bearing on whether an agent lacking authority enters a void or voidable contract for purposes of *D'Oench* transfers.

### G. That the Security Agreement Was Ratifiable Shows It Was Voidable, Not Void

The dissent concedes, as it must, that a principal can ratify an agent's unauthorized act and the security agreement was ratifiable by the law firm. Dissenting Op. at 15, 29–30. Even so, the dissent argues that "capacity for ratification does not undermine the [dissent's] conclusion that contracts purportedly formed by agents who lack authority are void." *Id.* at 29. We disagree.

Fundamental principles of agency and contract law establish that only a voidable contract is capable of ratification. Restatement (Second) of Contracts, *supra*, § 7 cmt. e ("[T]he term voidable contract is appropriate if ratification by one of the parties would terminate his power of avoidance and make the contract enforceable against him."); *Voidable*, Black's Law Dictionary (11th ed. 2019) (defining "voidable" as "capable of being affirmed or rejected at the option of one of the parties"); 1 Williston on Contracts, *supra*, § 1:20 (observing that because a voidable contract "is capable of ratification, it affects from the outset the legal relations of the parties" and "is properly defined as a contract"); 1 Corbin on Contracts, *supra*, § 1.6 (explaining that "[i]n every case [of a voidable contract], . . . it will be found that one of the parties has a legal power, either of avoidance or of ratification, or of both" and that it is equally accurate to describe such contracts as "ratifiable").[16]

In stark contrast, a truly void contract cannot be ratified and become enforceable. 1 Williston on Contracts, *supra*, § 1:20 ("[I]f a promise is void, it creates no legal obligation[,] and the promisor is without power to ratify promise [sic]."); Restatement (Second)

---

[16] Even if agent Hardwick manifests an assent to a contract with Crescent without authority, the principal in turn has two choices: it may elect to ratify—that is, manifest an assent to be bound by—the contract, or to avoid it. 12 Williston on Contracts, *supra*, § 35:22 ("When an agent lacks actual authority to agree on behalf of the principal, the principal may still be bound if it acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after acquiring knowledge of the material facts.").

of Contracts, *supra*, § 163 cmt. c (explaining, as to the distinction between void and voidable contracts, that "the recipient of a misrepresentation may be held to have ratified the contract if it is voidable but not if it is 'void'"). It is, was, and always will be a legal nullity that is enforceable against no one.

We do recognize that the dissent identifies decisions, applying state law, that conclude that void contracts can be ratified. Dissenting Op. at 30.[17] On the other hand, we located many other decisions, applying state law, which held a "void" contract is incapable of ratification. *See, e.g., Wamsley v. Champlin Refin. & Chems., Inc.*, 11 F.3d 534, 539 (5th Cir. 1993) ("Promises that are void cannot be ratified.")[18]; *Kelley v. Kelley*, 798 S.E.2d 771, 777 (N.C. Ct. App. 2017) ("It is well settled that a void contract cannot be the basis for ratification or estoppel."); *Kellar v. Est. of Kellar*, 291 P.3d 906, 917 (Wash. Ct. App. 2012) ("[A] contract that is void at its inception, as opposed to merely voidable, is an absolute

---

[17] The dissent cites mostly state cases, but its cited federal case also applies state law. *See Jensen v. Ray Kim Ford, Inc.*, 920 F.2d 3, 4 (7th Cir. 1990) (applying Illinois law).

[18] The Fifth Circuit's explanation is apt here:

> Promises that are void cannot be ratified. The reason for this is simple: Void promises are not legally binding and thus, are not contracts. [Restatement (Second) of Contracts, *supra*,] § 7 cmt. a. Without an antecedent contract to ratify, there can be no ratification.

*Wamsley,* 11 F.3d at 539.

nullity and is incapable of ratification."); *Ockey v. Lehmer*, 189 P.3d 51, 56 (Utah 2008) ("A contract or a deed that is void cannot be ratified or accepted, and anyone can attack its validity in court. In contrast, a contract or deed that is voidable may be ratified at the election of the injured party." (footnotes omitted)); *Est. of Molino*, 81 Cal. Rptr. 3d 512, 521 (Cal. Ct. App. 2008) ("Void contracts cannot be ratified."); *Richmond Printing v. Port of Hous. Auth.*, 996 S.W.2d 220, 224 (Tex. Ct. App. 1999) ("As a general rule, void contracts cannot be ratified."). In sum, we are faced with nonbinding authority on both sides of that issue.

Again, it is unnecessary and unwise to enter this state-law fray. As we observed in Section VI.E, courts sometimes use the terms "void" and "voidable" interchangeably. *See Griffin*, 989 F.3d at 934 n.7. And if we take this case authority at face value and assume that courts always correctly use the terms "void" and "voidable," the conflicting decisions—void contracts can versus cannot be ratified—seem impossible to reconcile.

Instead of trying to reconcile these decisions applying state law, we again rely on *Langley*, our *D'Oench* precedent, and the general definitions of "void" and "voidable," found in treatises and legal dictionaries, which establish that a principal's power to elect to ratify an agent's unauthorized contract by definition makes the contract merely voidable. *See Voidable*, Black's Law Dictionary (11th ed. 2019); Restatement (Second) of Contracts, *supra*, § 7 cmt. e; 1 Williston on Contracts, *supra*, § 1:20. While the principal may elect to avoid the contract, the contract is not "void" in the

technically accurate meaning of that term. *See Griffin*, 989 F.3d at 923; *Haggart*, 143 F. at 27. Because all agree that the Hardwick law firm could have ratified the security agreement in this case, that agreement was voidable and constituted an interest that was capable of transfer for purposes of *D'Oench*. *See Gordy*, 928 F.2d at 1565.

At bottom, the dissent fails to distinguish voidable contracts from binding contracts. Rather, the dissent conflates binding contracts with voidable contracts and applies a binding v. void dichotomy. For example, the dissent argues that: "The status of a contract executed by an agent as void or voidable turns on whether the agent has the authority to bind the principal." Dissenting Op. at 15. As we have explained, the question is not whether the contract was ultimately binding on the Hardwick law firm. Instead, the proper and narrow inquiry for *D'Oench* transfer purposes is whether the facially valid and fully executed written contract was already void or merely voidable when the FDIC took over. The void-voidable dichotomy should be applied here, and the security agreement was voidable because it was capable of being affirmed or rejected at the option of the law firm. *See supra* Section V.B at 37–43.

### H.  Comment c to § 4.01 of the Third Restatement of Agency (2006) and comment a to § 82 of the Second Restatement of Agency (1958)

Finally, we address the dissent's reliance on Restatement comments. The dissent attempts to "mak[e] sense of the

conflicting authority in this area of law," but admits that "is no easy task." Dissenting Op. at 32. To do so, the dissent cites (1) comment c to § 4.01 of the Third Restatement of Agency; and (2) comment a to § 82 of the Second Restatement of Agency. *Id.* at 33–34. While the dissent purports to "shed[] light on the matter," it misconstrues these two comments to support its arguments that no contract, or only a void contract, was formed. *See id.* at 32.

Neither comment states, or even suggests, an agent's unauthorized contract is void unless ratified by the principal. Indeed, the dissent alleges only that comment a to § 82 of the Second Restatement "strongly implies that a contract entered by an agent who lacks authority, prior to ratification, is void." *Id.* at 32–33. There is also no use of the term "void" in the corresponding text of the Restatement where these comments appear. At a minimum, these comments do not bear the heavy weight the dissent places on them.

The dissent also argues that under agency law "a principal must take affirmative steps to ratify a contract formed by an agent who lacked authority." *Id.* at 35. The Third Restatement, however, makes clear that ratification can also result from a principal's failure to act. Restatement (Third) of Agency, *supra*, § 4.01 cmt. f. Specifically, a principal with notice "may ratify an act by failing to object to it or to repudiate it" or by delaying "expressing an objection to an unauthorized act." *Id.* In fact, the principal need not even communicate the ratification to the agent or the third party for it to be effective. *Id.* § 4.01 cmt. d. It is telling

that the dissent fails to explain how ratification-by-silence is an affirmative act that binds the principal.

In addition, even assuming for sake of argument that the principal must affirmatively manifest assent to *ratify* a contract entered by an agent, that contract still would be *ratifiable* and thus *voidable*. The Restatements' commentary does not support the dissent's contention that "a contract entered by an agent who lacks authority, prior to ratification, is void, not voidable." Dissenting Op. at 32–33.

## VII.    CONCLUSION

We conclude that Landcastle's lack-of-authority claims are barred under *D'Oench* because they rely on evidence that was outside Crescent's records when the FDIC took over and sold the Hardwick loan and CD collateral to Renasant.

We do not "invent" any new, much less "radical and untenable," rules of agency or contract law. *Id.* at 1, 37–38. Rather, we also conclude that Hardwick's acting outside the scope of his authority did not render the security agreement void but, at most, only voidable. As *Langley* teaches, a voidable interest is sufficient to pass the CD security agreement to the FDIC and to trigger the *D'Oench* shield. *See* 484 U.S. at 94, 108 S. Ct. at 402.

Accordingly, we reverse the district court's order, dated June 8, 2020, and remand with instructions to enter final judgment in favor of Renasant.

**REVERSED AND REMANDED.**

20-13735          WILLIAM PRYOR, C.J., dissenting          1

WILLIAM PRYOR, Chief Judge, dissenting:

This appeal concerns whether the Federal Deposit Insurance Corporation can steal assets from third parties when it takes over a failed bank. Named after the Supreme Court decision in which it was first recognized, *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447 (1942), the *D'Oench* doctrine bars private parties from raising claims or defenses that rely on evidence outside the failed bank's records. But the doctrine applies only when the claim or defense would "diminish or defeat" an "interest" that the failed bank transferred to the Deposit Corporation. *See* 12 U.S.C. § 1823(e); *see also Lindley v. Fed. Deposit Ins. Corp.*, 733 F.3d 1043, 1052–53 (11th Cir. 2013). Here, a private party argues that its agent lacked the authority to enter into a purported agreement on its behalf and that the principal was not bound, so the failed bank obtained no "interest" in the purported agreement that could have been transferred to the Deposit Corporation in the first place. *See* 12 U.S.C. § 1823(e). In that context, the *D'Oench* doctrine is not implicated, so I would affirm the judgment of the district court.

The majority erroneously determines, as a matter of federal common law, that the *D'Oench* doctrine applies anyway. To reach this conclusion, it relies on a radical and untenable interpretation of agency law. According to the majority, an agent acting without actual or apparent authority can nevertheless bind its purported principal. The principal must then take affirmative steps if it wishes to avoid the contract the unauthorized agent made. Because the

2                WILLIAM PRYOR, C.J., dissenting            20-13735

majority's decision relies on fundamental misunderstandings about agency relationships and contract formation, creates serious Takings Clause concerns, and contradicts Supreme Court precedent, I respectfully dissent.

## I. BACKGROUND

The relevant facts in this appeal are largely undisputed. Nathan Hardwick was a named partner at Morris Hardwick Schneider, LLC, a law firm wholly owned by MHSLAW, P.C. MHSLAW was the sole member of Morris Hardwick. Hardwick and the firm's other named attorneys, Arthur Morris and Randolph Schneider, were managers of Morris Hardwick and owners of MHSLAW. Hardwick owned 50% of MHSLAW, and Morris and Schneider each owned 25%.

Morris Hardwick's operating agreement and MHSLAW's bylaws governed how the respective companies' assets could be pledged. Morris Hardwick's operating agreement prohibited any manager from causing the company to guarantee the obligation of a person "without the affirmative vote of the [m]embers holding a [m]ajority [i]nterest." (Emphasis omitted.) Because MHSLAW was the sole member of Morris Hardwick, the operating agreement effectively required MHSLAW to vote to pledge Morris Hardwick's assets to guarantee a third party's obligation. MHSLAW's bylaws, in turn, prohibited directors from pledging assets "without the affirmative vote of the majority of . . . the shareholders." (Emphasis omitted.) So, none of the named attorneys, including Hardwick, could pledge any firm asset to guarantee a third party's obligation

unless Hardwick and at least one of the other named attorneys voted to authorize the guarantee.

In 2009, Hardwick entered into several agreements with Crescent Bank & Trust Company, some of which he signed in his personal capacity and some of which he signed as a "managing member" of Morris Hardwick. First, he used $631,276.71 to purchase a certificate of time deposit from Crescent. The parties dispute who owned the funds that Hardwick used to purchase the certificate, but both parties agree that Crescent issued the certificate to Morris Hardwick. Hardwick then took out a personal loan from Crescent for the same amount, $631,276.71. Next, to secure his personal loan with sufficient collateral to satisfy Crescent, Hardwick—purporting to act as "managing member" of Morris Hardwick even though he was not a member—pledged the certificate to Crescent.

Hardwick executed four separate documents. He executed a commercial security agreement, which listed the certificate as his personal property and as collateral on the personal loan. He also executed several documents as a "managing member" of Morris Hardwick: a corporate resolution, an assignment of the certificate to Crescent, and a hypothecation agreement. Robert Driskell, Morris Hardwick's Chief Financial Officer, also signed the corporate resolution as an "authorized signer" for the certificate-of-deposit account. Neither party disputes that no shareholder vote authorized Hardwick to execute these documents, and there is no evidence that Morris or Schneider knew about these particular transactions.

4                  WILLIAM PRYOR, C.J., dissenting            20-13735

The corporate resolution "grant[ed] . . . [d]eposit authority by the governing body of the business entity to specified individuals." The document is formatted as a checklist of possible authorizations. The resolution specifies that the "[w]ords or phrases preceded by a [box] are applicable only if the [box] is marked." No boxes on the document were marked even though some authorizations specified whether Hardwick *and* Driskell—instead of Hardwick alone—were given the particular authorization. The potential authorizations included the authorization to make "deposits to" and "withdrawals from" the certificate account and to "[t]ransfer funds from the account[] . . . to any account" and "[t]ransfer funds to the account[] . . . from any account." From the document, we can infer that those authorizations were not granted.

Hardwick purported to execute the assignment and hypothecation agreement on behalf of Morris Hardwick. The assignment—the key document of interest in this case—represented that Morris Hardwick "assign[ed] and transfer[red] to [Crescent Bank], and . . . [gave Crescent] a security interest" in the certificate. The assignment was "to secure the payment of . . . all present and future debts" Hardwick personally owed Crescent. The hypothecation agreement provided that in the event of default, Crescent could marshal the certificate to satisfy the debt.

In 2010, Crescent failed. The Federal Deposit Insurance Corporation closed Crescent and put it into receivership. Renasant Bank then purchased Crescent's assets.

20-13735          WILLIAM PRYOR, C.J., dissenting          5

The Deposit Corporation administers the federal deposit insurance system, which was created by Congress in 1933 and works to insure deposits at banks and savings institutions. *See* 12 U.S.C. § 1811(a). The Deposit Corporation supervises and regulates banks to identify and address risks to the insurance funds. When a bank fails, the Deposit Corporation must quickly decide whether to liquidate the failed bank's assets to pay its depositors and other creditors or to enter into a purchase-and-assumption agreement where another institution purchases the assets and assumes the liabilities of the failed bank.

Because these decisions must "usually" be made "overnight," a combination of federal common law and statute called the *D'Oench* doctrine helps the Deposit Corporation make informed decisions. *See Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir. 1982), *abrogated on other grounds by Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 93 (1987). The most accurate "method of evaluating" the options "is relying on the books and records of the failed bank to estimate what assets would be returned by a purchasing bank and to estimate which of those assets ultimately would be collectible." *Id.* at 870. The *D'Oench* doctrine aids the Deposit Corporation by barring private parties from seeking to defeat or diminish its interests by relying on evidence outside the failed bank's records. *See Langley*, 484 U.S. at 93. By relying on the failed bank's official records, the Deposit Corporation is able to more easily obtain a reliable estimate of the failed bank's assets. *See Gunter*, 674 F.2d at 870. If it could not obtain such an estimate, the purchase-

and-assumption option might be "effectively foreclosed," *see id.*, because potential purchasers might hesitate before accepting that level of risk.

Although the record does not establish when Hardwick stopped making payments on the loan, Renasant determined in 2014 that Hardwick was in default and applied the proceeds of the certificate to offset the amount that Hardwick owed. That same year, Morris Hardwick assigned its interest in the certificate to Landcastle Acquisition Corporation.

Landcastle then filed an administrative claim with the Deposit Corporation to recover the amount of the certificate. After the Deposit Corporation refused to pay the claim, Landcastle sued Renasant for conversion and breach of contract, alleging that Renasant did not have the right to liquidate the certificate or to use the proceeds to offset Hardwick's personal loan. Landcastle and Renasant both moved for summary judgment.

Landcastle contended that Hardwick lacked the authority to pledge the certificate as collateral for his personal loan. It argued that Hardwick lacked actual authority because the governing documents of Morris Hardwick and MHSLAW conditioned actual authority on a shareholder vote. Landcastle further argued that Hardwick lacked apparent authority because his pledge of a firm asset as collateral for a personal loan was not "apparently for the carrying on in the usual way the business and affairs" of Morris Hardwick. *See* GA. CODE § 14-11-301(c)–(d). Landcastle asserted that self-interested transactions are categorically not "carrying on . . . the

20-13735          WILLIAM PRYOR, C.J., dissenting          7

business and affairs" of a company "in the usual way." *See id.* § 14-11-301(c).

Renasant agreed that Hardwick lacked actual authority to bind Morris Hardwick, but it argued that he had apparent authority to execute the agreements because Morris Hardwick had not satisfied its burden to offer facts about its usual way of business. Renasant also argued that Hardwick had apparent authority because the managers collectively failed to observe corporate formalities, the company and managers commingled the managers' personal finances with company funds, and Crescent was familiar with Morris Hardwick and Hardwick individually.

Renasant also made an alternative argument about the *D'Oench* doctrine. It argued that even if Hardwick lacked authority, the *D'Oench* doctrine barred Landcastle from asserting its claim because Landcastle necessarily relied on evidence outside the bank's records to defeat its interest in the certificate. And it argued that Hardwick's lack of authority rendered the agreements at worst voidable, and not void, so the *D'Oench* doctrine applied.

The district court denied Renasant's motion. It first concluded that the *D'Oench* doctrine does not bar private parties from asserting as a claim or defense that the agent who executed the agreement lacked authority to do so. The district court reasoned that enforcing a claim (or establishing a defense) based on lack of authority does not require a court to enforce an agreement with or obligation against the bank that is not within its records. It determined that, in those circumstances, the bank is the party that is

trying to enforce the agreement or obligation that might or might not exist. The district court likened lack of authority to forgery, which it concluded resembles fraud in the factum. And the district court relied on the Supreme Court's decision in *Langley v. Federal Deposit Insurance Corp.*, which stated that the *D'Oench* doctrine would not bar a "fraud in the factum" defense because fraud in the factum renders an agreement entirely void. *See* 484 U.S. at 93.

The district court also denied Landcastle's motion for summary judgment. It reasoned that, under Georgia law, Landcastle had the initial burden of proving the absence of apparent authority. It then explained that Landcastle had flipped the burden to Renasant to establish the presence of apparent authority because Landcastle had established that Hardwick entered the transaction for personal purposes. And it concluded that Renasant had satisfied that burden with enough evidence to create a genuine dispute of fact but not enough to warrant summary judgment in its favor.

The district court certified its summary-judgment order for immediate appeal. *See* 28 U.S.C. § 1292(b). The district court stated that there were two controlling questions of law for which there are substantial grounds for difference of opinion and that an interlocutory appeal would materially advance the litigation. *See id.* First, "[d]oes *D'Oench* bar a claim (or defense) that the agent who signed the agreement with the bank purportedly lacked authority to do so?" And second, "[u]nder [Georgia Code Section] 14-11-301, who bears the burden to demonstrate whether an agent who pledged company assets for personal use was 'apparently carrying

20-13735          WILLIAM PRYOR, C.J., dissenting          9

on in the usual way the business and affairs' of the [limited liability company], and what is the nature of that burden?"

Renasant timely filed a petition for interlocutory appeal but chose to pursue only the *D'Oench* question. We granted review and clarified that we would consider only whether the *D'Oench* doctrine "bar[s] a claim (or defense) that the agent who signed the agreement with the bank purportedly lacked authority to do so." The parties briefed whether the *D'Oench* doctrine bars a claim or defense based on lack of authority, and, if so, whether the doctrine would bar Landcastle's claim in this case.

## II. STANDARD OF REVIEW

We review certified questions of law *de novo*. *Johnson v. City of Fort Lauderdale*, 148 F.3d 1228, 1229 n.3 (11th Cir. 1998); *see also* 28 U.S.C. § 1292(b). But our appellate jurisdiction is not limited to the question of law identified by the district court. *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1275 (11th Cir. 2020). Instead, we have jurisdiction over the order certified, and we "may address any issue fairly included within the certified order." *Id.* (quoting *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996)). But we have counseled that the "legal question" in a section 1292(b) appeal "must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law." *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004). So, we have the discretion to limit our review to the "discrete and abstract legal issue the district court

identified." *Barrientos*, 951 F.3d at 1275; *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1272 (11th Cir. 2006); *see also* 16 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3929 (3d ed. Apr. 2022 update). To the extent that we review the order beyond the pure question of law identified by the district court, we employ our normal standards of review. Here, the district court denied both parties' motions for summary judgment, so we review that order *de novo. See Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1296 (11th Cir. 2021).

### III. DISCUSSION

I divide my discussion into three parts. First, I explain why Landcastle's claims are not barred by the *D'Oench* doctrine. Second, I explain the basic principles of agency law that prevent an agent who lacks authority from binding a principal in contract. Third, I explain the problems created by the majority's new rule.

### A. The D'Oench Doctrine Does Not Apply to Lack of Authority, Which Prevents a Failed Bank from Obtaining an Interest That Can Be Transferred to the Deposit Corporation.

Although the *D'Oench* doctrine is a messy combination of common law and statute, it "is simply a rule" that protects federal deposit insurers and their successors in interest from some claims or defenses that the insurers could not have discovered by examining the failed bank's records. *See Lindley*, 733 F.3d at 1051; *Vernon v. Resol. Tr. Corp.*, 907 F.2d 1101, 1106 (11th Cir. 1990). It applies when a private party who has "lent himself to a scheme or

20-13735          WILLIAM PRYOR, C.J., dissenting          11

arrangement whereby" the bank insured by the federal deposit insurer "was or was likely to be misled," *D'Oench*, 315 U.S. at 460, asserts a claim or defense that "tends to diminish or defeat the interest" of the federal deposit insurer, 12 U.S.C. § 1823(e); *see also Lindley*, 733 F.3d at 1052–53.

When the doctrine applies, a private party is barred from relying on any evidence outside the failed bank's records to support his claim or defense. *See Lindley*, 733 F.3d at 1051. And when the asset at issue is an instrument, federal deposit insurers and their successors in interest have "a quasi-holder-in-due-course status," *see Vernon*, 907 F.2d at 1106, even when they would not be entitled to holder-in-due-course status under state law, *see Fed. Deposit Ins. Corp. v. McCullough*, 911 F.2d 593, 603 n.10 (11th Cir. 1990). This status benefits the Deposit Corporation and its successors in interest because "[t]he right of . . . holder[s] in due course to enforce the obligation of a party . . . is subject" only to a limited number of "real defenses." *See* U.C.C. § 3-305(a)(1), (b) & cmt. 1 (AM. L. INST. & UNIF. L. COMM'N 2002) (internal quotation marks omitted).

The *D'Oench* doctrine does not protect federal deposit insurers from all claims and defenses. *See, e.g.*, *Langley*, 484 U.S. at 93–94; *Vernon*, 907 F.2d at 1106 n.4. The doctrine applies only to claims and defenses that "tend[] to diminish or defeat the interest" of the federal deposit insurer in an asset. *See* 12 U.S.C. § 1823(e); *Lindley*, 733 F.3d at 1052–53. The *D'Oench* doctrine does *not* apply where the failed bank did not have and could not have transferred

12                    WILLIAM PRYOR, C.J., dissenting            20-13735

an interest to the insurers. *See Langley*, 484 U.S. at 93–94. That is, the *D'Oench* doctrine protects preexisting interests; it does not create new ones.

The Supreme Court explained this limitation in *Langley*. W.T. and Maryanne Grimes Langley had executed a facially unqualified promissory note in favor of a bank, which later transferred the note to the Deposit Corporation. *Id.* at 88–89, 93. Defending against the enforcement of the note, the Langleys argued that the note was "procured by [the bank's] misrepresentations." *Id.* at 88–89. The Langleys argued that the *D'Oench* doctrine did not apply to fraudulent representations or warranties at all. *Id.* at 93. The Court rejected that broad argument but explained that "[t]he presence of fraud could be relevant . . . [to] the requirement that the agreement in question tend to diminish or defeat the . . . interest" of the federal deposit insurer. *Id.* (alteration adopted) (internal quotation marks omitted).

The Supreme Court concluded that the *D'Oench* doctrine does not bar private parties from asserting a fraud-in-the-factum defense, *id.*, even though that defense will almost always be based on evidence "not found in the failed bank's official records," *see* Maj. Op. 33. It explained that "the real defense of fraud in the factum" would "render the instrument entirely void," and an instrument that is "entirely void" creates "no . . . 'interest'" that "c[an be] transfer[red] to the" Deposit Corporation. *Langley*, 484 U.S. at 93–94 (quoting 12 U.S.C. § 1823(e)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 163 & cmt. a (AM. L. INST. 1981); *Laborers'*

*Pension Fund v. A&C Env't, Inc.*, 301 F.3d 768, 780 (7th Cir. 2002) ("[A]ssent procured by fraud in the [factum] renders the agreement void and the purported contract . . . nonexistent."). And because there is no interest in a void instrument that can be transferred to the Deposit Corporation, establishing a fraud-in-the-factum defense would not "ten[d] to diminish or defeat" the Deposit Corporation's "interest" in the asset. *Langley*, 484 U.S. at 93–94 (alteration in original) (quoting 12 U.S.C. § 1823(e)).

But the Supreme Court concluded that the *D'Oench* doctrine does apply to defenses that render a contract voidable—as opposed to void—such as fraud in the inducement. *See id.* at 94, 96. It explained that the bank's alleged misrepresentations in *Langley* "constitute[d] only fraud in the inducement," not "fraud in the factum." *See id.* at 94. It then examined whether, if the note were procured by fraud in the inducement, the bank would have obtained any interest in the note that it could have transferred to the Deposit Corporation. *See id.* Fraud in the inducement "renders [a] note voidable but not void." *Id.* A voidable note is a contract that "is valid and has its usual legal consequences until" a party elects to avoid it. *See* RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. e. So, in *Langley*, the failed bank obtained "voidable title" in the note. *Langley*, 484 U.S. at 94. That is, the bank obtained an "interest," 12 U.S.C. § 1823(e), in the note that was "valid . . . until" the Langleys elected to void it, *see* RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. e. The Supreme Court concluded that voidable title is an "interest" that can be "diminish[ed] or defeat[ed]" for purposes of the

*D'Oench* doctrine. *Langley*, 484 U.S. at 94 (alterations in original) (quoting 12 U.S.C. § 1823(e)).

### B. An Agent Without Authority Cannot Bind a Principal in Contract.

Because the *D'Oench* doctrine applies only to preexisting interests, courts must first determine whether, if the claim or defense is successful, the failed bank ever had an interest in the asset that could be "diminish[ed] or defeat[ed]." *See* 12 U.S.C. § 1823(e); *accord Andrew D. Taylor Tr. v. Sec. Tr. Fed. Sav. & Loan Ass'n*, 844 F.2d 337, 342–43 (6th Cir. 1988); *Grubb v. Fed. Deposit Ins. Corp.*, 868 F.2d 1151, 1158 (10th Cir. 1989); *Fed. Deposit Ins. Corp. v. Bracero & Rivera, Inc.*, 895 F.2d 824, 830 (1st Cir. 1990). So, the outcome of the present case turns on whether, if Hardwick lacked authority to pledge Morris Hardwick's certificate, Crescent ever held an interest in the certificate that it could have transferred to the Deposit Corporation.

To answer that question, we look to general commercial law. The asset at issue in *Langley*, a promissory note, was governed by Louisiana law. *See Langley*, 484 U.S. at 88. But the Supreme Court, as a matter of federal common law, looked to general commercial law in considering the legal effect that fraudulent inducement and fraud in the factum would have had on the note, with reference to the Uniform Commercial Code, the Second Restatement of Contracts, and Farnsworth's casebook on contracts. *Id.* at 93–94.

20-13735        WILLIAM PRYOR, C.J., dissenting        15

The common law of agency and contracts is not always a model of clarity, but we can still derive a few fundamental principles that suffice to resolve the case before us. First, a contract cannot be formed without the mutual assent of the parties bound by it. Second, an agent who purports to form a contract on a principal's behalf—but, in fact, lacks the authority to do so—does not form a contract enforceable against the principal. Third, the purported contract becomes enforceable against the principal only if he takes affirmative steps to ratify it, which manifest his assent to the agreement.

The status of a contract executed by an agent as void or voidable turns on whether the agent has the authority to bind the principal. *Contra* Maj. Op. 50. A voidable contract binds the parties until it is repudiated, but a void contract never binds the parties. And whether a contract is void or voidable, in turn, determines whether an interest was ever created for purposes of the *D'Oench* doctrine. *Langley*, 484 U.S. at 93–94. So, the following discussion, which addresses when an agent can bind a principal in contract, is not "far afield" from the certified question but rather goes to the very heart of it. *Contra* Maj. Op. 51.

According to the first key principle, a contract can only be formed with the consent of the parties bound by it. With limited exceptions not relevant here, "the formation of a contract" under general contract law "requires . . . mutual assent to the exchange." RESTATEMENT (SECOND) OF CONTRACTS § 17(1). "The manifestation of mutual assent . . . ordinarily takes the form of an offer or

16                     WILLIAM PRYOR, C.J., dissenting              20-13735

proposal by one party followed by an acceptance by the other party or parties." *Id.* § 22(1). An agent can act on behalf of a principal to make or accept an offer in accordance with the law of agency. *See id.* § 52 cmt. c. For this act to occur, the following steps are required: the principal "manifest[s] assent to the agent's power"; the "agent enters into a contract on behalf of [his] principal by manifesting assent to an exchange"; and "[t]he third party manifests assent . . . to the agent." *See* RESTATEMENT (THIRD) OF AGENCY § 6.01 cmt. b (AM. L. INST. 2006).

According to the second key principle, when an agent lacks authority to form a contract on the principal's behalf, no contract results. So, when an agent purports to "enter[] into [a] contract on [its] principal's behalf . . . without actual or apparent authority," the "*principal is not a party to [that] contract.*" *Id.* § 6.05 cmt. b (emphasis added). In other words, "[a]n agent can bind its principal to a contract" only if "the agent has actual authority" or if the "contract[] [is] made by the agent . . . within the scope of the agent's apparent authority." 3 AM. JUR. 2D *Agency* § 83 (Nov. 2022 Update); *see also* RESTATEMENT (THIRD) OF AGENCY § 6.01. An agent acting without authority cannot bind a principal unless the principal takes an affirmative step to bind himself, known as "ratification."

An agent's false representation of authority does not alter the fact that he lacks authority. It is a "basic proposition that a principal is not accountable simply because the agent has succeeded in misleading the third party about the extent or nature of the agent's authority." *Id.* § 2.03 cmt. c. No contract is formed between the

20-13735          WILLIAM PRYOR, C.J., dissenting          17

principal and the third party because "[a] principal is not subject to liability when an agent" acts without authority, even if the agent "defrauds a third party." *See id.* § 7.08 cmt. c(2); *see also id.* § 6.11(1) ("When an agent for a disclosed . . . principal makes a false representation about the agent's authority to a third party, the principal is not subject to liability unless the agent acted with actual or apparent authority in making the representation and the third party does not have notice that the agent's representation is false.").

Settled precedent recognizes this principle. As long ago as 1852, the Supreme Court held that "it is a well-settled principle of law, and nowhere controverted, that if an agent exceed[s] his authority his acts in such excess do not bind his principal." *Very v. Levy*, 54 U.S. 345, 349 (1852). More recently, we held in *Gymco Construction Co. v. Architectural Glass & Windows, Inc.* that because an agent "lacked authority to enter into a . . . contract" between his principal and a third party, "there was no [such] contract." 884 F.2d 1362, 1367 (11th Cir. 1989).

The majority's attempts to distinguish our precedent in *Gymco* are unavailing. The *Gymco* decision rested on alternative holdings. We held that the agent "lacked authority to enter into a new contract," and we alternatively held that the agent "could not agree to modify the written contract orally." *Id.* That the purported contract between the agent and the third party was an oral contract was necessary only to the latter alternative holding. *Contra* Maj. Op. 64–65. The former holding confirms that an agent cannot create a contract on a principal's behalf without authority—a

fundamental principle that does not depend on the details of *Gymco*'s facts. Our holding also did not rely on a determination that the principal had repudiated the contract, as opposed to the fact that no contract was formed, to reach its conclusion. *Contra id.* at 65. We mentioned repudiation only to support the proposition that the agent lacked actual authority, but we proceeded to assess apparent authority separately. *See Gymco*, 884 F.2d at 1366. That the third party could not reasonably have believed that the agent had authority was necessary to establish that apparent authority did not exist. *See* Maj. Op. 64–65. Our holding was clear: the agent formed no contract because he lacked the authority to do so. And that principle applies beyond the facts of *Gymco*.

In *In re JLJ Inc.*, 988 F.2d 1112 (11th Cir. 1993), we likewise held that a contract purportedly made by an agent who lacked authority to bind the principal was "void." We considered the validity of an assignment of debt by an agent acting under power of attorney. We held that "[i]f [the principal] orally revoked the power of attorney . . . , then the assignment [the agent] executed one week later would be *void*." *Id.* at 1116 (emphasis added). We remanded the case "to the bankruptcy court for factual findings regarding whether [the principal] orally revoked the power of attorney before [the agent] assigned the debtor's promissory notes . . . on [the principal's] behalf." *Id.* at 1117. Although the agent in *JLJ* allegedly lacked authority because the principal had revoked it—in contrast with the agent here, who allegedly exceeded his authority—the same principle applies: an agent cannot bind a principal in contract

20-13735          WILLIAM PRYOR, C.J., dissenting          19

when he lacks the authority to do so. The resulting purported contract is void.

The majority's attempt to distinguish *JLJ* is also unavailing. This Court reasoned that the assignment "would be void if [the principal] orally revoked the power of attorney before [the agent] executed the assignment." *Id.* at 1116. So, it directly stated that an agreement entered by an agent who lacked authority is void. *Contra* Maj. Op. 67–68. Because that determination was necessary to the disposition of the appeal—in fact, it was the only reason this Court remanded the case to the district court, *JLJ*, 988 F.2d at 1117—it constituted part of our holding, *see United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("What matters in discerning whether a rule of law expounded by a court is in fact holding is whether it was *necessary* to the result reached . . . ."). The *JLJ* Court expressly relied on Alabama law only to determine under what circumstances the power of attorney could be revoked. *See JLJ*, 988 F.2d at 1116–17 (citing *Cooper v. Cooper,* 91 So. 82, 84 (Ala. 1921)). *Contra* Maj. Op. 67 & n.14. But it did not suggest that its holding that the assignment of the notes would be void if the agent's power of attorney had been revoked depended on a peculiarity of Alabama law. And our statement in a separate, unpublished opinion that courts in general, and Alabama courts in particular, tend to use the terms "void" and "voidable" imprecisely does not alter the weight of existing precedent. *Contra* Maj. Op. 68 (citing *United States v. Ruan*, 796 F. App'x 672, 675–76 (11th Cir. 2020)).

20                WILLIAM PRYOR, C.J., dissenting            20-13735

Many courts have similarly concluded that when an agent who lacks authority purports to bind a principal in contract, the resulting instrument is void. *See, e.g.*, *United States v. Marin*, 651 F.2d 24, 29 (1st Cir. 1981) ("Since [the agent] lacked authority to contract for the corporation, and since the corporation never ratified his action, the . . . lease [that the agent had purportedly signed on the principal's behalf] was void."); *Woods v. Wells Fargo Bank Wyo.*, 90 P.3d 724, 733 (Wyo. 2004) (explaining that "[u]ltra vires acts of a corporate president or other agent are void unless" apparent authority existed or the act was later ratified); *Spengler v. Sonnenberg*, 102 N.E. 737, 739 (Ohio 1913) ("If the agent assumes to make a contract in excess of this authority, the agreement is void and unenforceable."); *Siena at Old Orchard Condo. Ass'n v. Siena at Old Orchard, L.L.C.*, 75 N.E.3d 420, 442 (Ill. App. Ct. 2017) ("A contract executed by a party that does not have authority is void *ab initio*." (Citation omitted)); *O'Neal v. O'Neal*, 803 S.E.2d 184, 189 (N.C. Ct. App. 2017) (holding, where an agent acted under an invalid grant of power of attorney, that "the deeds that [the agent] executed pursuant to [the purported agency relationship] were void *ab initio*"); *1230 Park Assocs., LLC v. N. Source, LLC*, 852 N.Y.S.2d 92, 93 (N.Y. App. Div. 2008) (holding that a third-party lender "did not have a valid and enforceable security interest in the [principal's] collateral, as [the agent] had no authority, apparent or otherwise, to pledge [the principal's] property as collateral for the loans").

20-13735          WILLIAM PRYOR, C.J., dissenting          21

Notably, the Fifth Circuit concluded in a context particularly analogous to this appeal that a contract purportedly formed by an agent who lacks authority is void. *See In re Northlake Dev. L.L.C.*, 643 F.3d 448 (5th Cir. 2011). At issue was whether a contract made by a minority member of an LLC, who deeded "substantially all of the LLC's real estate" to his own company "without authority," was "(i) voidable, such that it [was] subject to the intervening rights of a subsequent bonafide purchaser for value and without notice, or (ii) void *ab initio, i.e.,* a legal nullity[.]" *Id.* at 450 (quoting *In re Northlake Dev., L.L.C.,* 614 F.3d 140, 145 (5th Cir. 2010)). Based on the Mississippi Supreme Court's answer to its certified question, the Fifth Circuit determined that "the deed was . . . 'void and of no legal effect' because" the agent "lacked actual or apparent authority to convey" the property "and [the principal] never ratified the purported transfer." *Id.* at 450 (quoting *Northlake Dev. L.L.C. v. Bank-Plus,* 60 So.3d 792, 794 (Miss. 2011). It cogently explained that "[w]here no actual or apparent authority exists to transfer a principal's property, . . . the deed is void unless and until later ratified." *Id.* at 451 (alteration adopted) (quoting *Northlake Dev. L.L.C.,* 60 So.3d at 797).

An informative line of caselaw also arises under the Federal Arbitration Act. These decisions address whether courts or arbitrators should decide disputes over whether a contract that includes an arbitration clause was formed by an agent who lacked authority. If no contract exists, no agreement to arbitrate binds the parties. Although it did not address the issue on the merits, in a footnote,

the Supreme Court classified the question "whether the signor lacked authority to commit the alleged principal" as bearing on "whether *any agreement between the alleged obligor and obligee was ever concluded.*" *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) (emphasis added). So, the Supreme Court—in a decision applying "federal substantive law," *id.* at 445–47 (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 12 (1984))—understood that an agent who purports to form a contract on behalf of his principal but lacks authority to do so forms no contract at all.

The majority's attempt to undermine our reliance on *Cardegna* is unavailing. *See* Maj. Op. 72. In *Rintin Corp., S.A. v. Domar, Ltd.*, we recognized that the *Cardegna* Court "held that under the Federal Arbitration Act, a challenge to the validity of a contract containing an arbitration clause, rather than to the arbitration clause itself, should be determined in the first instance by the arbitrators." 476 F.3d 1254, 1259 (11th Cir. 2007). So, the distinction between void and voidable contracts was ultimately "irrelevant." *Id.* But we, like the Supreme Court, recognized a distinction "between challenges to the validity of a contract with an arbitration clause and arguments that a party never consented to such a contract." *Id.* at 1259 n.3; *see also Cardegna* at 444 n.1. Because Rintin did not argue that it had "never effectively consented to the Agreement," we determined that "we need not pursue the line of cases mentioned in [the *Cardegna* footnote]." *Rintin Corp.*, 476 F.3d at 1259 n.3. The statements in both *Cardegna* and *Rintin*

20-13735         WILLIAM PRYOR, C.J., dissenting         23

distinguishing questions of contract validity from questions of contract formation—and, in *Cardegna*, the statement indicating that an agent's lack of authority created an issue of contract formation—are informative, even if only dicta.

What's more, a majority of our sister circuits have agreed that if an agent was not authorized to form the contract, no contract exists, nor does an agreement to arbitrate. *See, e.g.*, *Nat'l Fed'n of the Blind v. Container Store, Inc.*, 904 F.3d 70, 81 (1st Cir. 2018) ("A challenge to formation can also be done by showing that . . . a signatory did not possess the authority to commit the principal . . . ."); *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 109 (3d Cir. 2000) (explaining that a "failure to demonstrate how the arbitration agreement exists if [the agent] lacked authority to bind [the principal] places the [arbitration] clause's validity in dispute"); *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 238 (4th Cir. 2019) ("[I]f the agent . . . lacks authority to bind his principal . . . to a contract with a third party . . . yet purports to do so anyway, no contract is formed between the principal and the third party."); *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018) ("[T]he Supreme Court has suggested that the category of arguments that question the very existence of an agreement include[s] . . . whether the signor lacked authority to commit the alleged principal . . . ." (Internal quotations marks omitted)); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) (Easterbrook, J.) (explaining that, when a contract was purportedly formed by "a faithless agent who lacked authority to make that

commitment," "no contract came into being"); *GP3 II, LLC v. Litong Cap., LLC*, 35 F.4th 1124, 1127 (8th Cir. 2022) ("[A] signor's authority to bind a purported principal is an issue of contract formation . . . ."); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991) (explaining that the question of "whether the signatory had authority to bind the plaintiffs to the agreement" must be decided by a district court because it "go[es] to the very existence of a contract that a party claims never to have agreed to"); *see also Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992) (explaining, in a forgery case, that the determination of whether a "non-signing party can nonetheless be bound by the contractual language," including under agency principles, goes to "the very existence of *any* agreement").

The majority's attempt to disregard this entire line of caselaw is unpersuasive. *See* Maj. Op. 72–73. It contends that the Federal Arbitration Act cases are irrelevant because "[f]or *D'Oench* purposes, we must determine whether the FDIC had an *interest* (including a voidable interest) that could be diminished or defeated," whereas "[i]n the arbitration context . . . courts look at whether an arbitration agreement is *binding* on the principal." *Id.* at 73. But the majority identifies two sides of the same coin. An interest can be created only through a binding contract. So, authorities that address when an agent forms a binding contract to arbitrate inform our understanding of when an agent forms a binding contract that creates an *interest* for the purposes of the *D'Oench* doctrine.

20-13735          WILLIAM PRYOR, C.J., dissenting                    25

Like our precedents and many persuasive authorities, I refer to a purported contract created by an agent who lacks authority alternatively as either "no contract" or "void." A "void" contract is "[a] promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor." RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. a. "[S]uch a promise *is not a contract at all*; it is [a] 'promise' or 'agreement' that is void of legal effect." *Id.* (emphasis added); *see also* 1 WILLISTON ON CONTRACTS § 1:20 (4th ed. Oct. 2022 Update) ("Void promises are not legally binding, have no legal effect, and, therefore, are not contracts."). Likewise, where the Restatement of Agency refers to "an agent mak[ing] a contract with a third party" without authority, RESTATEMENT (THIRD) OF AGENCY § 6.05(1), the comments clarify that "[o]rdinarily[] a principal is *not a party* to [such] a contract," *id.* cmt. b (emphasis added). At least for present purposes, there is no meaningful difference between saying that the agent formed no contract, formed a void contract, or formed a contract to which the principal was not party. In any event, no valid contract was formed involving the principal.

Yet the majority concludes that a contract can be formed in this circumstance. Renasant, and the amici that support it, argue that the *D'Oench* doctrine applies because an unauthorized agent can form a *voidable* contract between his purported principal and a third party. So, they determine that the failed bank obtained an interest in the contract that it could transfer to the Deposit Corporation. *See Langley*, 484 U.S. at 93–94.

26          WILLIAM PRYOR, C.J., dissenting          20-13735

I have already explained why, based on fundamental principles of contract and agency law, an agent who lacks authority cannot form a contract that is enforceable against the principal. By contrast, the formation of a voidable contract would lead to very different implications. According to the Restatement of Contracts, "[t]he propriety of calling a transaction a voidable contract rests primarily on the traditional view that the transaction is valid and has its usual legal consequences until the power of avoidance is exercised." RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. e; *see also* 1 WILLISTON ON CONTRACTS, *supra*, § 1:20 ("Unless rescinded, a voidable contract imposes on the parties the same obligations as if it were not voidable."); *Voidable*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "voidable" as something that is "[v]alid until annulled" and as "*a valid act* that may be voided rather than an invalid act that may be ratified" (emphasis added)). To hold that an agent who lacks authority to bind the principal can create a presumptively valid contract contravenes the most basic tenets of agency and contract law.

The majority attempts to take a middle road. It contends that "[a] voidable contract is not the same as a binding contract." Maj. Op. 61–62. And it asserts that I "conflate[] binding contracts with voidable contracts." *Id.* at 77. Here, the majority invents a new category of contract: neither void nor binding. No such category exists. *See Griffin v. Coca-Cola Refreshments USA, Inc.*, 989 F.3d 923, 934 (11th Cir. 2021) ("[I]f the assignments are merely voidable, then they are effective unless and until they are

20-13735        WILLIAM PRYOR, C.J., dissenting        27

challenged."). Even the majority elsewhere acknowledges that "a voidable contract imposes on the parties the same obligations as if it were not voidable" and that a voidable contract "remains intact until the party who has the power of avoidance elects to exercise it." Maj. Op. 40 (quoting 1 WILLISTON ON CONTRACTS, *supra*, § 1:20); *see also id.* at 39 (quoting *Black's Law Dictionary* for the proposition that "voidable" means "[v]alid until annulled"). In other words, a voidable contract *binds the parties* unless and until the party who enjoys the power of avoidance chooses to exercise it.

With respect to terminology, agency law is not always as precise as one might hope. *See generally Void*, BLACK'S LAW DICTIONARY, *supra* (explaining that "[t]he distinction between *void* and *voidable* is often of great practical importance" but that "the word [void] is often used and construed as bearing the more liberal meaning of 'voidable'"). The majority identifies some nonbinding authorities that refer to contracts formed by agents who lack authority as "voidable." *See* Maj. Op. 41–42. But the majority has not cited a single judicial decision holding a principal bound, over its objection, by the act of an agent who lacked authority unless the principal later ratified the contract. *See id.* at 41–42, 75–76.

And some of the authorities that the majority cites expressly state that an agent cannot bind the principal without some affirmative act of ratification. For instance, one authority states that "[t]he principal is not bound by any act that exceeds the agent's

authority, . . . unless the principal ratifies the agent's acts." 2A C.J.S. AGENCY § 163 (footnotes omitted). Another explains that "[w]ithout authority for an agent to bind its principal in a contract with a third party, or without the principal's subsequent ratification, the contract must be set aside." 3 AM. JUR. 2D *Agency*, *supra*, § 164; *see also* 12 WILLISTON ON CONTRACTS, *supra*, § 35:22 ("[R]atification . . . supplies original authority to execute the contract."); *Fejta v. GAF Companies, Inc.*, 800 F.2d 1395, 1396–97 (5th Cir. 1986) (holding that, when an agent was not authorized to "transact[] the sale or ratify[] the contract, . . . under Louisiana law the contract to sell was unenforceable").

In theory, I share considerable common ground with the majority. I maintain—and at times the majority appears to agree— that a contract created by an agent who lacks authority cannot be enforced against the principal without his consent. *See* Maj. Op. 61–62. But we disagree as to the characterization of the resulting purported agreement. By logical implication, and consistent with our precedent, the purported agreement is a void contract that is unenforceable unless ratified, not a "voidable" contract that is "[v]alid until annulled." *Voidable*, BLACK'S LAW DICTIONARY, *supra*. I also maintain—and the majority agrees—that such an agreement can be ratified by the principal. *See generally* Maj. Op. 73–74. We again disagree regarding what the principal's power to ratify implies about the nature of the purported contract, an issue to which I now turn.

20-13735　　　　WILLIAM PRYOR, C.J., dissenting　　　　29

According to the third key principle, a principal can become bound by a contract that his agent who lacks authority purports to enter on his behalf, but only if he takes an affirmative step to bind himself. "Through ratification, a person may *become* a party to a contract purportedly made on that person's behalf by another who acted without actual or apparent authority." RESTATEMENT (THIRD) OF AGENCY § 6.01 cmt. b. (emphasis added). "When the prior act did not otherwise affect the legal relations of the ratifier, ratification provides the basis on which the ratifier's legal relations are affected by the act." *Id.* § 4.01 cmt. b. Ratification in this context is a retroactive manifestation of assent that "*creates* claims *not otherwise present*" and "*giv[es]* . . . the third party enforceable rights." 3 AM. JUR. 2D *Agency*, *supra*, § 186 (emphases added). Ratification may occur by silence, but only when the principal "has notice that others are likely to draw such an inference from silence." RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. f. In those circumstances, silence is an affirmative choice. *See* Maj. Op. 78–79. Ratification binds a principal to an agreement to which he was not bound before; it forms a contract where none earlier existed.

The majority erroneously states that the very possibility of ratification establishes that the contract was not void but voidable. *Id.* at 73–75. It contends that "only a voidable contract is capable of ratification." *Id.* at 74. Though it does not matter to this appeal whether a void contract can be ratified, I explain why the capacity for ratification does not undermine the conclusion that contracts purportedly formed by agents who lack authority are void. Again,

30                    WILLIAM PRYOR, C.J., dissenting                    20-13735

imprecise language in some authorities easily gives rise to confusion. In our effort to apply the general commercial law, we must hew closely to fundamental principles and follow the guidance of our own precedent.

Although the majority cites some decisions—none of which are binding on this Court—that state that only voidable contracts can be ratified, *see id.* at 75–76, other courts have reached the opposite conclusion, *see, e.g.*, *Jensen v. Ray Kim Ford, Inc.*, 920 F.2d 3, 4 (7th Cir. 1990) (holding that a "contract is a nullity and does not bind" the plaintiffs because "a forged note is by the common law absolutely void, unless it has in some way been ratified by the payor" (citation omitted)); *Scott D. Erler, D.D.S. Profit Sharing Plan v. Creative Fin. & Invs., L.L.C.*, 203 P.3d 744, 754 (Mont. 2009) ("While acknowledging that void contracts do not legally exist and transfer no rights, we have nonetheless permitted ratification of such contracts."); *Bush v. Evans*, 598 So. 2d 952, 954 (Ala. Civ. App. 1992) ("Where the statute of frauds applies, a contract made by an agent without authority in writing from his principal is void unless ratified by the principal."); *Bethune v. Larson*, 544 N.E.2d 49, 52 (Ill. App. Ct. 1989) ("A void act of an agent can be ratified by a principal where the principal has knowledge of the facts."); *cf. Hancock v. Kulana Partners, LLC*, 452 P.3d 371, 374 n.4 (Haw. 2019) ("We note that the courts are split as to whether a void deed can be ratified."). *See generally Voidable*, BLACK'S LAW DICTIONARY, *supra* ("[Voidable] describes a valid act that may be voided rather than *an invalid act that may be ratified.*" (Emphasis added)).

20-13735        WILLIAM PRYOR, C.J., dissenting                31

Indeed, some decisions in analogous cases have concluded that a contract purportedly formed by an agent without authority is *void until ratified*. *E.g.*, *Marin*, 651 F.2d at 29 ("Since [the agent] lacked authority to contract for the corporation, and since the corporation *never ratified* his action, the . . . lease was *void*." (Emphasis added)); *In re Northlake Dev. L.L.C.*, 643 F.3d at 450–51 ("Where no actual or apparent authority exists to transfer a principal's property, . . . the deed is *void unless and until later ratified*." (Quoting *Northlake Dev. L.L.C.*, 60 So.3d at 797 (alterations adopted) (emphasis added)); *Northlake Dev. L.L.C.*, 60 So.3d at 797 (explaining that when a contract is void for lack of authority, "[a]bsent ratification—and prior to ratification—nothing changes"); *Woods*, 90 P.3d at 733 (explaining that "[u]ltra vires acts of a corporate president or other agent are void unless under agency principles" there has been "ratification [by] the corporation" or apparent authority exists).

Our precedent supports the same conclusion. In *GDG Acquisitions LLC v. Government of Belize*, Belize argued that a minister who signed a contract "lacked the authority to waive sovereign immunity." 849 F.3d 1299, 1302 (11th Cir. 2017). Nonetheless, we held that Belize was bound by the contract because it had ratified the waiver. *Id.* We observed that "[w]hile '[o]nly interactions that are within the scope of an agency relationship affect the principal's legal position,' the principal may also ratify his agent's *unauthorized* actions, thus becoming bound by their legal consequences." *Id.* at 1308 (internal citation omitted) (quoting

RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c). Belize objected that "an agreement that is void *ab initio* cannot be enforced against a sovereign under a ratification theory because subsequent payments cannot create actual authority that did not exist at the time of the actions." *Id.* at 1310 (internal quotation marks omitted). Instead of holding that the agreement was not void, we explained that Belize's "argument misapprehends the nature of ratification." *Id.* "It is precisely on account of the principal's subsequent consent that the prior unauthorized act 'is given effect as if done by an agent acting with actual authority.'" *Id.* (quoting RESTATEMENT (THIRD) OF AGENCY § 4.01(1)). Contrary to the majority's response, our Court did not "reject[] Belize's argument that the lease was 'void *ab initio*.'" *Contra* Maj. Op. 69 (citation omitted). We instead rejected the argument that a contract formed without authority could not be *ratified. GDG*, 849 F.3d at 1310. We recognized that a contract entered by an agent who lacked authority initially had no legal effect on the principal, but the principal was empowered to ratify it later.

Making sense of the conflicting authority in this area of law is no easy task, but a comment to the definition of "ratification" in the *Restatement (Second) of Agency*, which we have cited favorably, sheds light on the matter. *See* RESTATEMENT (SECOND) OF AGENCY § 82 (AM. L. INST. 1958); *see also McDonald v. Hamilton Elec., Inc. of Fla.*, 666 F.2d 509, 514 (11th Cir. 1982) (citing the Restatement provision favorably). The first comment to Section 82

strongly implies that a contract entered by an agent who lacks authority, prior to ratification, is void, not voidable.

It explains that ratification in the agency context is unique—it must be "distinguished from the affirmance of a voidable transaction," and it binds the principal to a contract that previously had no legal impact on him:

> Ratification, as the word is here used, represents a legal concept in the law of agency describing the relations between the parties after affirmance by a person of a transaction done or purported to be done for him. . . . Ratification is to be distinguished from the affirmance of a voidable transaction because of fraud or mistake, and from the affirmance of a transaction, voidable because of partial lack of capacity. . . . In the sense in which the word is used in the Restatement of this Subject, ratification connotes that the act was done or purported to be done *for a person who acquired no rights or liabilities because of it, except the right to elect to become a party to it.*

RESTATEMENT (SECOND) OF AGENCY § 82 cmt. a (emphasis added).

The comments to the Third Restatement's definition of "ratification" offer the same explanation. A comment entitled "*[r]elated doctrines apart from agency*" states that an affirmative action is necessary in order for a principal to be bound by the "legal

34                WILLIAM PRYOR, C.J., dissenting             20-13735

consequences" of the contract purportedly entered by the agent, unlike in other legal contexts:

> The agency-law doctrine of ratification is not the exclusive instance in the law of a person choosing to become bound by a transaction not otherwise binding or becoming subject to the legal consequences of another's act. For example, a person may elect to become bound by a contract that is voidable because assent was induced by fraud, mistake, or duress. *See* Restatement Second, Contracts § 7, Comment *b*. A minor, or a person who otherwise lacks capacity, may elect to be bound by a voidable contract once capacity is present. *See id. The agency-law doctrine of ratification, in contrast, requires manifesting assent* or otherwise consenting to a prior act done by another person and thereby adopting its legal consequences.

RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. c (emphasis added). The next comment further explains that "[r]atification requires an objectively or externally observable indication that a person consents that another's prior act shall affect the person's legal relations." *Id.* § 4.01 cmt. d. In this way, ratification in the agency context is distinct from ratification in other areas of law.

For these reasons, the majority's attempts to compare ratification in the agency-law context to ratification in other contexts are unavailing. *See* Maj. Op. 74–75. In agency law, ratification is different in kind from the mere termination of the power of avoidance described by contract-law authorities. *See* RESTATEMENT

20-13735          WILLIAM PRYOR, C.J., dissenting          35

(SECOND) OF CONTRACTS § 7 cmt. e; Maj. Op. 74. In other contexts, "action may be necessary in order to prevent the contract from producing the ordinary legal consequences of a contract." RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. e. Such is not the case when an agent who lacks authority purports to form a contract, because the purported contract is void.

To be sure, not all void contracts can be ratified. Several of the authorities that the majority cites for the proposition that a void contract cannot be ratified fall into this category. *See* Maj. Op. 75–76. For instance, a contract that violates public policy can never be ratified. *Est. of Molino v. Boldt*, 81 Cal. Rptr. 3d 512, 519, 520–21 (Cal. Ct. App. 2008). Nor can one that is "substantively and procedurally unfair." *Kellar v. Est. of Kellar*, 291 P.3d 906, 918 (Wash. Ct. App. 2012). In these cases, the problem is not a lack of mutual assent but rather a defect that ratification cannot cure.

In the end, our precedents make clear that contracts entered by agents who lack authority are void unless ratified, though capable of ratification. *See generally Gymco,* 884 F.2d 1362; *JLJ*, 988 F.2d 1112; *GDG Acquisitions*, 849 F.3d 1299. Three fundamental principles of agency and contract law—that a contract cannot be formed without mutual assent, that an agent who lacks authority cannot bind a principal, and that a principal must take affirmative steps to ratify a contract formed by an agent who lacked authority—compel the same answer. The Supreme Court in *Langley* held that a "void" instrument falls outside of section 1823(e) because it "leav[es] no right, title or interest that could be diminished or

defeated." *Langley*, 484 U.S. at 93–94 (alterations adopted) (internal quotation marks omitted). At bottom, a purported contract, executed by an agent who lacks authority and not ratified by the principal, cannot convey a right, title, or interest.

Because a third party (here, Crescent) obtains no interest when it enters into a purported agreement with an agent (Hardwick) who lacks authority to bind his principal (Morris Hardwick), the *D'Oench* doctrine cannot apply. *See Taylor Tr.*, 844 F.2d at 342–43 (stating, though in dicta, that an agent's lack of authority "is a real defense to the formation of a contract and renders the contract void *ab initio,* rather than merely voidable" in the context of a *D'Oench* analysis). The *D'Oench* doctrine is a powerful shield that the Deposit Corporation and its successors in interest can wield to protect interests they acquire from a failed bank. But it is not a sword that can be wielded to create an interest that the Deposit Corporation did not already have. If Landcastle can prove that Hardwick lacked the authority to pledge the firm's certificate as collateral for his personal loan, then it would establish that Crescent never obtained an interest that it could have transferred to the Deposit Corporation. And if there is no interest, then the *D'Oench* shield is of no use to Renasant.

## C. The Majority's New Rule Is Flawed.

The majority "reject[s] Landcastle's argument that Hardwick's lack of authority prevented Crescent's transfer of an interest in the security agreement to the FDIC as receiver." Maj. Op. 45. It does not "consider legal issues, such as lack of authority in this

*D'Oench* setting, in the abstract or in a vacuum." *Id.* at 44; *see also id.* (asserting that "[w]e . . . consider legal issues . . . in the context of the factual circumstances presented in this case"). *But see McFarlin*, 381 F.3d at 1259 (explaining that the "legal question" in a section-1292(b) appeal "must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case"). The majority considers it relevant that Hardwick represented to Crescent that he had authority from Morris Hardwick. *See* Maj. Op. 45. And it invents a new rule that when an agent misrepresents to a third party that he has authority, he can form a voidable contract between the third party and his principal. *Id.* But that factual context is irrelevant, and the majority's new rule is constitutionally dubious.

The majority's added "context[]" does not change the legal effect of Hardwick's purported lack of authority. *Id.* That Hardwick "induced the bank to make a loan" also should not change the result. *See id.* Even where "an agent defrauds a third party," his "principal is not subject to liability" for that fraud if the agent acts without authority. *See* RESTATEMENT (THIRD) OF AGENCY § 7.08 cmt. c(2). And it is a "basic proposition that a principal is not accountable simply because the agent has succeeded in misleading the third party about . . . the agent's authority." *Id.* § 2.03 n.c.

Although the majority does not dispute that an agent acting without authority does not have the same power to bind the principal as a duly authorized agent, *see* Maj. Op. 61–62, it somehow imagines that an agent's misrepresentation creates a binding

contract between his principal and a third party that is "[v]alid until annulled," *see Voidable*, BLACK'S LAW DICTIONARY, *supra*. Although it at times insists that the principal must ratify the agent's action, *see* Maj. Op. 61–62, it nevertheless holds that the principal should be bound despite a lack of any authority, *see id.* at 45. In effect, it asserts that if the agent fraudulently represented his authority to a third party, the agent's act would bind the principal unless the principal affirmatively acted to repudiate it. *See id.*

That rule does not come from *Langley* or any other source of law. *Contra id.* at 44–45. Because *Langley*'s fraudulent-inducement rule does not apply here, the majority charts its own path even as it purports to apply *Langley*. And federal common law does not provide that a principal becomes a party to a contract and is bound when an unauthorized agent purports to enter into that contract on his behalf so long as that agent engages in fraudulent behavior. General agency law, like black-letter agency law in every American jurisdiction, rejects that proposition.

Because the majority invents a new rule while purporting to rely on federal common law, it conveniently avoids engaging in the analysis required to create a new rule of federal common law. *See In re Prudential of Fla. Leasing, Inc.*, 478 F.3d 1291, 1298 (11th Cir. 2007). The decision to create a new federal common-law rule "is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Id.* (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728

20-13735          WILLIAM PRYOR, C.J., dissenting          39

(1979)). But before creating a new rule, we must consider at least three factors: "the need for uniformity," whether and the extent to which "application of state law frustrates important federal policies, and the impact" the federal common-law rule would have "on preexisting commercial relationships premised on state law." *Id.*; *see also Kimbell Foods*, 440 U.S. at 728–29.

When we have previously created new common-law rules to protect the Deposit Corporation, we have found it critical that the new rule did not disrupt commercial relationships. *See, e.g.*, *Gunter*, 674 F.2d at 872; *McCullough*, 911 F.2d at 603–04; *Fed. Deposit Ins. Corp. v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1517–18 (11th Cir. 1984); *see also In re Prudential*, 478 F.3d at 1298 ("The presumption [against creating a federal common-law rule] 'is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.'" (Quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991))). Our decisions highlighted that the interests of the private parties there were not indefeasible. *See Gunter*, 674 F.2d at 872; *McCullough*, 911 F.2d at 603–04; *Gulf Life Ins.*, 737 F.2d at 1517–18; *see also Langley*, 484 U.S. at 95–96 (explaining that section 1823(e) is in some respects similar to the requirement that a secured creditor record his security interest). So, giving a deposit insurer a quasi-holder-in-due-course status defeased only that already-defeasible interest. *See Gunter*, 674 F.2d at 872; *McCullough*, 911 F.2d at 603–04; *Gulf Life Ins.*, 737 F.2d at 1517–18.

Here, by contrast, the majority's new rule greatly disrupts commercial relationships. Georgia law dictates that lack of authority prevents contract formation. *See Lynn v. Lowndes Cnty. Health Servs., LLC*, 840 S.E.2d 623, 628–31 (Ga. Ct. App. 2020) (explaining that an agreement formed by a purported agent who lacked authority is unenforceable unless ratified by the principal); GA. CODE § 10-6-51. The majority contends that "if an agent acted without authority," Georgia law permits the principal to "either repudiate or ratify that contract." Maj Op. 57. But the majority does not specify whether the principal is bound by default under Georgia law. The Georgia statute that the majority cites provides only that "if the agent shall exceed his authority, the principal . . . shall adopt either the whole or none [of the contract]." GA. CODE § 10-6-51. I do not dispute the possibility of presumptive ratification by silence, for that doctrine further confirms that ratification is still necessary. *See* Maj. Op. 57 (citing *Lynn*, 840 S.E.2d at 631, for the proposition that "under Georgia law, where the principal is fully informed of the agent's unauthorized act and does not repudiate it *within a reasonable time*, ratification is presumed"). But Georgia law has long been clear: "An agent, constituted for a *particular* purpose . . . cannot bind his principal by any act in which he *exceeds his authority*; for that would be to say, that one man may bind another against his consent." *Hardeman & Hamilton v. Ford*, 12 Ga. 205, 207 (1852).

Without contract formation, the third party obtains no interest from the principal, and the principal loses no interest. *See*

*Gymco*, 884 F.2d at 1365–67; *Hagan v. Asa G. Candler, Inc.*, 5 S.E.2d 739, 743 (Ga. 1939); *see also Buena Vista Loan & Sav. Bank v. Stockdale*, 192 S.E. 246, 247 (Ga. Ct. App. 1937). And a principal can raise a lack-of-authority defense to defend against the enforcement of a negotiable instrument by a holder in due course. *See* GA. CODE §§ 11-1-201(b)(41), 11-3-302(a)(2)(iv), 305(a)–(b), 308(b), 401(a), 402(a), 403(a); *Buena Vista*, 192 S.E. at 247; *Berger v. Ga. Power Co.*, 49 S.E.2d 668, 669 (Ga. Ct. App. 1948); *see also* U.C.C. §§ 1-201(b)(41), 3-302(a)(2)(iv), 3-302 cmt. 2, 3-305(a)–(b), 3-308(b), 3-401(a), 3-402(a), 3-402 cmt. 1, 3-403(a), 3-403 cmts. 1–2; UNIF. NEGOTIABLE INSTRUMENTS L. § 23, U.L.A. Appendix I (2020). So, the majority's new rule gives the federal government an interest it did not have while depriving the private party of an interest it did have.

In response, the majority cites *Griffin*, 989 F.3d 923, for the proposition that contracts formed by agents who lack authority are voidable under Georgia law. *See* Maj. Op. 58–59. That decision identifies three types of contracts that are rendered void under the Georgia Code: contracts "to do immoral or illegal things," contracts that contravene public policy, and gambling contracts. *Griffin*, 989 F.3d at 934 (citing GA. CODE §§ 13-8-1, 13-8-2, 13-8-3). And it suggests that all other contracts are at most voidable. *Id.* at 935; *see also* Maj. Op. 58–59. But the decision has nothing to do with agency law or contract formation. If there were no contract—due to a lack of mutual assent or consideration or some other fundamental defect—a purported contract would not be simply voidable. On the contrary, under Georgia law, no contract would exist.

*See* GA. CODE § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."). So, it is here, too.

The majority also discusses the Georgia Supreme Court's decision in *Federal Financial Co. v. Holden*, 485 S.E.2d 481 (Ga. 1997). *See* Maj. Op. 30–31, 59. The majority cites *Holden* for the proposition that commercial relationships will not be disrupted by its decision. Maj. Op. 59. But the plaintiff in *Holden* was a creditor who sought "to establish his lien as senior." *Holden*, 485 S.E.2d at 482. That decision did not enforce an agreement executed by agents who lacked authority *against a principal* and *over his own objection*. So, *Holden* did not disrupt property rights in the way the majority does in this appeal.

Because the majority's new rule deprives private parties of property rights and gives those rights to the federal government, it creates serious Takings Clause concerns. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426 (2015) ("[A]n appropriation . . . of personal property" "is a *per se* taking that requires just compensation."); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164–65 (1980) (applying the Takings Clause to interest earned on a deposit fund); *E. Enters. v. Apfel*, 524 U.S. 498, 522–23 (1998) (plurality opinion) (applying the Takings Clause to required money payments). To illustrate, at time one, a principal has an indefeasible right to an asset, and a failed bank has no interest in that asset. At time two, the federal government acts and takes over the failed

bank. As a result of the federal government's action, the federal government appropriates the asset, and the principal loses all rights in the asset. Courts ordinarily call that a "taking," *see, e.g.*, *Horne*, 135 S. Ct. at 2426; the majority calls it "[e]quit[y]," Maj. Op. 45.

The majority's new rule gives Landcastle a plausible Takings Clause claim against the Deposit Corporation. In fact, Landcastle should be free on remand to argue that, because the *D'Oench* doctrine claim is unconstitutional as applied to its lack-of-authority claim, it can state claims for conversion and breach of contract. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 717 (1999) (plurality opinion) (explaining that an uncompensated taking is "not only unconstitutional but unlawful and tortious as well"); *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2180 (2019) (Thomas, J., concurring) (explaining that "ordinary remedial principles [of] . . . common-law tort claims" are available in response to a taking). But the majority has apparently resolved that question *sub silentio* because it remands with instructions to enter judgment in favor of Renasant. Maj. Op. 79. Left for another day is whether Landcastle might still be able to bring a separate claim against the Deposit Corporation for an unconstitutional taking. *See Knick*, 139 S. Ct. at 2170; *City of Monterey*, 526 U.S. at 717 (plurality opinion).

Before today, the *D'Oench* doctrine did not implicate the Takings Clause because the Supreme Court limited its application to protect only those interests that the Deposit Corporation already had. *See Langley*, 484 U.S. at 93–94. But the majority's extension of the *D'Oench* doctrine places it on much shakier constitutional

ground. Because the majority purports to apply the preexisting *D'Oench* doctrine, *see* Maj. Op. 44–45, it fails to engage in the *Kimbell Foods* analysis. And in that analysis, these Takings Clause problems would preclude creating this rule.

Even after considering the three *Kimbell Foods* factors, the decision to create a new federal common-law rule is "a matter of judicial policy." *In re Prudential*, 478 F.3d at 1298 (quoting *Kimbell Foods*, 440 U.S. at 728). So, we must balance the competing policy considerations before we exercise our limited discretion to create new rules. And in this respect, the majority's new rule falls woefully short.

Consider the following hypothetical. Butch Cassidy is the Vice President of Finance at Coca-Cola. He has authority to enter into many kinds of transactions on behalf of Coca-Cola. In fact, he has entered into several high-dollar agreements, taken out loans, and pledged collateral on behalf of Coca-Cola. Cassidy has a family and a house with a white picket fence in the suburbs. Everything appears to be going well, but he has badly mismanaged his finances. A bad turn of luck with a cryptocurrency investment and a nasty gambling habit have left him in dire straits. He is in default on his mortgage with no way to cure it and is days away from foreclosure.

So, Cassidy finds a small Atlanta-area bank named Old Bank that is severely distressed. He borrows enough money to pay off his mortgage and give him a little breathing room. He signs a promissory note, but Old Bank, of course, demands collateral to

20-13735          WILLIAM PRYOR, C.J., dissenting          45

secure the loan. Cassidy, an agent of Coca-Cola for many purposes, signs an agreement as "Butch Cassidy, Vice President of Coca-Cola." The agreement assigns all interests in Coca-Cola's secret formula to Old Bank. Even though he lacks both actual and apparent authority, he falsely represents to Old Bank that, as a benefit to senior officers, Coca-Cola gave him the authority to pledge the secret formula to secure personal debts. Old Bank fails, and the Deposit Corporation takes over as receiver. Our main character, Butch Cassidy, then defaults on the loan because, unsurprisingly, he continues to mismanage his finances.

Under the majority's new rule, the federal government now owns Coca-Cola's secret formula free and clear! The Deposit Corporation has legal title to the secret formula, and Coca-Cola is out of luck. And the majority does not even attempt to deny that its rule would require this absurd result.

Perhaps the majority seeks to protect the Deposit Corporation because it believes the Deposit Corporation is more deserving than the private party in this case. A criminal, who has now been convicted for similar crimes, see United States v. Maurya, 25 F.4th 829, 835–36 (11th Cir. 2022), misrepresented his authority to a small bank. On this misrepresentation, Hardwick pledged an asset of his law firm—which the majority suspects is at fault, see Maj. Op. 13 n.4, and which sold its interests at a discount to an acquisition firm—to secure a personal loan that he never repaid. The Deposit Corporation came to the rescue and found a benevolent

buyer who saved the residents of Georgia who had relied on the failed bank.

But the majority is mistaken. The "[e]quities" do not favor the Deposit Corporation, *contra id.* at 45, because the equities cannot favor governmental theft. "If th[e] requirement[s] [of the Constitution] make[] some regulatory programs unworkable in practice, so be it—our role is to enforce the Takings Clause as written." *Cf. Knick*, 139 S. Ct. at 2180 (Thomas, J., concurring) (citation and internal quotation marks omitted).

Moreover, the Deposit Corporation is not powerless to defend itself against claims or defenses based on lack of authority. For example, it can require banks, as a condition of insurability, to keep records documenting an agent's authority for every transaction. *See* 12 U.S.C. §§ 1815(a)(1), (4), 1816(5) (requiring the Deposit Corporation to consider "[t]he risk presented" by a bank before insuring it); *id.* § 1818(a)(2)(A)(i) (allowing the Deposit Corporation to terminate insurance if the bank is "engaging in unsafe or unsound practices"); *cf. Langley*, 484 U.S. at 95 (explaining that the Deposit Corporation is vulnerable only when it is "unable to detect" potential liability). If Crescent had required Morris Hardwick to provide documentation establishing Hardwick's authority to engage in the transaction, we would not be here.

## IV. CONCLUSION

The majority misunderstands the *D'Oench* doctrine, even though the Supreme Court has explained it and at least three of our

20-13735          WILLIAM PRYOR, C.J., dissenting          47

sister circuits got the message: the Deposit Corporation cannot acquire an interest that is void before the Deposit Corporation purports to acquire it. *See Taylor Tr.*, 844 F.2d at 342–43 (stating, though in dicta, that an agent's lack of authority "is a real defense to the formation of a contract and renders the contract void *ab initio,* rather than merely voidable" in the context of a *D'Oench* analysis); *Grubb*, 868 F.2d at 1158 (explaining that, because the notes at issue "already had been *voided* by [a] judgment when the FDIC purchased [the bank's] assets," "the FDIC acquired no right, title or interest" (citation and internal quotation marks omitted)); *Bracero & Rivera*, 895 F.2d at 830 (holding that, "because the note [at issue] was discharged by the payment and cancellation of the underlying debt before FDIC ever obtained it," "the note was not an asset protected by section 1823(e)"). Similarly, in this appeal, no interest exists because the contract purportedly conveying the interest was void. The majority misunderstands the general commercial law of agency and contract. As a result, the majority's decision licenses governmental theft, creates serious constitutional problems without any discussion, and contradicts Supreme Court precedent. I would affirm the judgment of the district court.

I respectfully dissent.